551 S.E.2d 693

**Rebecca Carolyn SNIDER, Plaintiff below, Appellee,**

v.

**Clarence Edward Don SNIDER, Defendant below, Appellant.**

No. 28719.

Supreme Court of Appeals of West Virginia.

Submitted April 3, 2001.

Decided July 9, 2001.

Rebecca Carolyn Snider, Pro se.

Charles G. Johnson, Esq., Robin Queen Triplett, Esq., Johnson, Simmerman & Broughton, L.C., Delby B. Pool, Esq., Clarksburg, West Virginia, Attorneys for the Appellant.

STARCHER, Justice:

In this appeal of a domestic relations action from the Circuit Court of Harrison County, we are asked to examine the jurisdiction of a circuit court to award alimony to the appellee and to equitably divide the parties' marital property, when one party to the marriage had previously been granted a divorce decree in a foreign jurisdiction. The appellant, who obtained a divorce in a jurisdiction that could not assert personal jurisdiction over the appellee, contends that the foreign divorce decree voided West Virginia's jurisdiction to adjudicate the parties' property interests. In sum, the appellant argues that the foreign decree extinguished West Virginia's personal jurisdiction over the appellant, and its subject matter jurisdiction over any interests incidental to the parties' marriage.

After examining the record and the briefs of the parties, we conclude that West Virginia can properly assert personal jurisdiction over the appellant. We further conclude that spousal support and marital property rights survive a foreign divorce decree when the foreign court did not have personal jurisdiction over the defendant in the foreign proceeding.

As set forth below, we affirm the circuit court's award of alimony to the appellee, and affirm the circuit court's equitable distribution of the parties' marital property.

I.

*Facts and Background*

In the instant divorce action, the parties dispute whether the defendant below and appellant, Clarence Edward Don Snider, is subject to our divorce, equitable distribution, and spousal support statutes. The circuit court in the instant case determined that Mr. Snider would be subject to West Virginia law and the jurisdiction of West Virginia's courts. To understand the basis for this conclusion requires an examination of Mr. Snider's contacts with the State of West Virginia.

The parties to the instant divorce action are the appellant, Mr. Snider, and the plaintiff below and appellee, Rebecca C. Snider. The parties were married on January 20, 1973, in Garrett County, Maryland. Ms. Snider had two children from a previous union, and Mr. Snider adopted them both. The children are now emancipated.

Mr. Snider was employed by various glass companies throughout the marriage. Between 1973 and 1993, he was employed by five different companies, requiring that he move from West Virginia to Pennsylvania, back to West Virginia, and again to Pennsylvania. Finally, from 1987 until 1993, Mr. Snider was employed by a glass company in New Jersey.

During the marriage, Ms. Snider was an "at-home mom," raising the children, cook-

ing, and cleaning. Ms. Snider was also charged with arranging for the selling of each house and packing up its contents whenever Mr. Snider took a job in another state.

At some time during 1993, a colleague of Mr. Snider moved to a new job in Elgin, Illinois, and asked Mr. Snider to join him. Mr. Snider apparently agreed to seek a new job with a glass company in Illinois.

Shortly thereafter, in January 1994, the parties traveled to West Virginia to visit with Ms. Snider's family. During the visit, Mr. Snider inspected a townhouse that was being offered for sale in Bridgeport, West Virginia. Mr. Snider informed his wife that he liked the townhouse, and would like to live there when he retired. After several weeks, the parties returned to New Jersey, contacted a realtor, and placed their New Jersey home on the market. The parties also made an offer to purchase the townhouse in West Virginia.

In March 1994, Mr. Snider began working as a consultant, ostensibly under a 6–month contract, for a glass company in Elgin, Illinois. During his time in Illinois, Mr. Snider lived in a motel at company expense. Three months later, the parties were able to complete the purchase of the townhouse in Bridgeport, West Virginia. Mr. Snider arranged the financing for the townhouse, by phone, with a bank in West Virginia.

During the Thanksgiving and Christmas 1994 holidays, the parties spent time in the West Virginia townhouse with other family members. The house in New Jersey was finally sold in January 1995, and both parties worked together to pack their household belongings for the move to West Virginia. The move to the townhouse was completed in March 1995, and Mr. Snider stayed several days in the West Virginia townhouse to unpack. However, he subsequently returned to the contract job in Illinois.

Ms. Snider contends that, throughout 1995 and 1996, Mr. Snider would routinely stay with her for extended weekends, 3 and 4 days at a time, and for several weeks around

holidays, at the townhouse in Bridgeport. While at the townhouse, he would ask her to check the newspapers for want ads, suggesting he intended to return to West Virginia to work. Mr. Snider would also send his wife romantic cards. She claims that Mr. Snider repeatedly said that he was planning to quit his job in Illinois and return to Bridgeport to live. Friends and relatives would ask him when he was quitting his job in Illinois, to which he would reply, "Soon." Mr. Snider discouraged Ms. Snider from moving to Illinois because of the cost, and because of his impending retirement. However, Mr. Snider continued to extend his contract in Illinois.

In January and again in April 1997, Mr. Snider visited his wife in Bridgeport, and informed her he was retiring—and returning to West Virginia—in July. Unfortunately, in June 1997, Mr. Snider announced that he wanted a divorce.

Mr. Snider filed for divorce in the Circuit Court of Kane County, Illinois on October 3, 1997, alleging that the parties had been separated on a continuous basis since March 1994. Ms. Snider countered by filing the instant divorce action in the Circuit Court of Harrison County, West Virginia on October 24, 1997.

The Illinois circuit court granted a "judgment dissolving the parties' marriage" on April 1, 1998. However, the Illinois circuit court did not address any other matters, such as the equitable distribution of the parties' marital property or spousal support.[1]

Mr. Snider then moved to dismiss the West Virginia divorce action, contending that because of the Illinois ruling, the West Virginia courts lacked personal jurisdiction over him. On August 8, 1998, the family law master entered an order rejecting Mr. Snider's motion, concluding that the Illinois courts had exercised jurisdiction only over the marriage of the parties. The family law master ruled that West Virginia courts had jurisdiction over the assets of the parties located in West Virginia, and over Mr. Snider

---

1. Ms. Snider appealed the circuit court's judgment, but it was subsequently affirmed by the Appellate Court of Illinois, Second District. *See* *In re Marriage of Snider,* 305 Ill.App.3d 697, 238 Ill.Dec. 843, 712 N.E.2d 947 (1999).

personally due to his numerous contacts with the State of West Virginia.

The parties then presented evidence to the family law master, who subsequently recommended findings of fact and conclusions of law to the circuit court. In an order dated January 28, 2000, the circuit court adopted the family law master's findings and conclusions, and ordered the equitable distribution of the marital assets of the parties. The circuit court also required Mr. Snider to pay Ms. Snider $2,500.00 per month in spousal support, and to pay her attorney's fees.

Mr. Snider now appeals the circuit court's January 28, 2000 order.

## II.

### *Standard of Review*

■ In appeals involving domestic relations matters, we employ a three-pronged standard of review established in Syllabus Point 1 of *Burnside v. Burnside*, 194 W.Va. 263, 460 S.E.2d 264 (1995):

In reviewing challenges to findings made by a family law master that also were adopted by a circuit court, a three-pronged standard of review is applied. Under these circumstances, a final equitable distribution order is reviewed under an abuse of discretion standard; the underlying factual findings are reviewed under a clearly erroneous standard; and questions of law and statutory interpretations are subject to a *de novo* review.

With this standard in mind, we review the arguments of the parties.

## III.

### *Discussion*

The appellant, Mr. Snider, argues that the circuit court's order is void because the court had neither personal jurisdiction over Mr. Snider, nor subject matter jurisdiction over the equitable distribution of the parties' marital property and any spousal support.

■ It is a common occurrence for one party to a marriage to seek a divorce in a jurisdiction that is foreign to the other party. This practice, where one spouse obtains a divorce in a foreign jurisdiction without the participation of the other spouse, is known as an *"ex parte* divorce." Courts examining these occurrences have developed the "divisible divorce" doctrine, thereby allowing courts to separate resolution of the *ex parte* divorce from the resolution of the parties' other marital interests—such as child custody and support, spousal support, and the distribution of marital property.

A "divisible divorce" is a brief way of indicating that while a decree in a divorce case may be valid insofar as it grants a divorce, it may be invalid with respect to, or it may have no effect upon, separable personal rights.

24A *Am.Jur.2d, Divorce and Separation,* § 1182 (1998) (footnote omitted).

■ Jurisdiction over an action to dissolve a marriage may be based on the domicil of just one spouse. *See, e.g., Fletcher v. Fletcher,* 95 Md.App. 114, 619 A.2d 561 (1993). However, if a court has jurisdiction over only one spouse but not the other, "the 'divisible divorce' concept permits the court to dissolve the marital relationship of the parties . . . without addressing the property rights and obligations of the parties." 24 *Am.Jur.2d, Divorce and Separation,* § 206 (1998). By allowing one state to grant an *ex parte* divorce of the marriage, and another state with jurisdiction over both parties to address the property rights and obligations of the parties, the interests of both states are accommodated, "restricting each State to the matters of her dominant concern." *Estin v. Estin,* 334 U.S. 541, 549, 68 S.Ct. 1213, 1218, 92 L.Ed. 1561, 1569 (1948).[2]

---

2. In *Estin,* the United States Supreme Court considered a situation where a husband and wife were married and lived in the State of New York. The husband abandoned his wife, and the wife filed an action for, and received, a decree of separation. A New York court awarded the wife permanent alimony. The husband then went to Nevada and filed an action for, and received, a decree of divorce. The Nevada court made no award of alimony.

The Supreme Court concluded that the Nevada court could not constitutionally exercise personal jurisdiction over the wife, because she had no contacts with Nevada. However, the Court acknowledged that the interests of a State—such as its interests over marital relations—extends to its

We acknowledged and adopted the divisible divorce doctrine in *Burnett v. Burnett,* 208 W.Va. 748, 750–51, 542 S.E.2d 911, 916–918 (2000). In *Burnett,* we concluded that a West Virginia order requiring a husband to pay child support to his wife was not superseded by a later Arkansas order granting the husband a divorce. We ruled in *Burnett,* at Syllabus Point 1, that the right of a West Virginia citizen to seek child and spousal support from a West Virginia court "is not superseded by a subsequent divorce decree obtained in a foreign state where the foreign state did not have *in personam* jurisdiction over both parties."

In the instant case we are not asked to address the validity or effect of a "*subsequent* divorce decree obtained in a foreign state," that is, a decree obtained after a West Virginia court has granted a party to a marriage some relief. Instead, we are asked to address the validity of a *preceding* divorce decree that has been obtained *ex parte* in a foreign state, and its effect upon the jurisdiction of a West Virginia court seeking to adjudicate the property rights and obligations of the parties to a marriage.

We begin our analysis by noting that West Virginia courts have jurisdiction over domestic relations actions when at least "one of the parties ... at the time the cause of action arose" has been "an actual bona fide resident of this state and has continued so to be for at least one year next preceding the commencement of the action[.]" *W.Va.Code,* 48–2–7(b) [1985]. The jurisdiction over both parties to a marriage may be established in West Virginia upon a showing that one

spouse is domiciled in West Virginia. *See Carty v. Carty,* 70 W.Va. 146, 73 S.E. 310 (1911).

In the instant case, the record clearly establishes that Ms. Snider was an actual, *bona fide* resident of West Virginia for more than 1 year prior to the date she filed the instant action.[3] Accordingly, the family law master and the circuit court were correct to find jurisdiction could be asserted over Mr. Snider and, more specifically, his marriage to Ms. Snider.[4]

Mr. Snider contends, however, that he has insufficient contacts with the State of West Virginia, such that personal jurisdiction may not fairly and constitutionally be asserted over him. As we stated in Syllabus Point 1 of *Pries v. Watt,* 186 W.Va. 49, 410 S.E.2d 285 (1991):

The Due Process Clause of the Fourteenth Amendment to the United States Constitution operates to limit jurisdiction of a state court to enter a judgment affecting the rights or interests of a nonresident defendant. This due process limitation requires a state court to have personal jurisdiction over the nonresident defendant.

We discussed the evidence necessary to establish constitutionally-acceptable personal jurisdiction over a non-resident defendant in a divorce-related action in Syllabus Point 2 of *Pries v. Watt,* stating:

In order to obtain personal jurisdiction over a nonresident defendant, reasonable notice of the suit must be given the defendant. There also must be a sufficient connection or minimum contacts between the

domiciliaries. Accordingly, the Court ruled that the divorce was divisible—the result was "to give effect to the Nevada decree insofar as it affects marital status" but also give effect to the New York decree on the issue of alimony.

3. We note that Ms. Snider also filed her action while the parties were married, six months before the Illinois court entered its divorce decree. We do not, however, consider this fact to be dispositive in the instant case.

4. Courts apply a two-step approach to determine whether personal jurisdiction exists over a nonresident defendant. "The first step involves determining whether the defendant's actions satisfy our personal jurisdiction statutes set forth in *W.Va.Code,* 31–1–15 [1984] and *W.Va.Code,* 56–

3–33 [1984]. The second step involves determining whether the defendant's contacts with the forum state satisfy federal due process." Syllabus Point 5, in part, *Abbott v. Owens–Corning Fiberglas Corp.,* 191 W.Va. 198, 444 S.E.2d 285 (1994).

In the instant case, Mr. Snider's actions appear to satisfy our personal "long-arm" jurisdictional statutes, and he does not challenge the circuit court's jurisdiction on this point. Instead, Mr. Snider appeals the determination of whether his contacts with the State of West Virginia satisfy federal due process. Our opinion therefore focuses primarily on this second factor of the *Abbott* analysis.

defendant and the forum state so that it will be fair and just to require a defense to be mounted in the forum state.

Mr. Snider asserts that he is a "nonresident defendant," and goes on to argue that he has only minimal contacts with the State of West Virginia.

We reject Mr. Snider's position. The family law master plainly concluded, and the circuit court adopted, as a matter of fact, that Mr. Snider maintained a marital relationship with Ms. Snider in West Virginia, repeatedly leading her and others to believe that the marriage was viable, that the parties would reunite upon his retirement from his job in Illinois, and the marriage would continue indefinitely. Mr. Snider purchased marital real estate—the townhouse—in West Virginia, secured a loan for the property through a West Virginia bank, and lived at the townhouse exclusively when he was in West Virginia. We stated, in Syllabus Point 3 of *Pries v. Watt*, that:

> To what extent a nonresident defendant has minimum contacts with the forum state depends upon the facts of the individual case. One essential inquiry is whether the defendant has purposefully acted to obtain benefits or privileges in the forum state.

The family law master was not clearly wrong in concluding that Mr. Snider had substantial contacts with West Virginia, and purposefully acted to obtain benefits and privileges from this State. We therefore hold that the family law master and circuit court correctly found contacts sufficient to constitutionally support the personal jurisdiction of a West Virginia court over Mr. Snider.

Mr. Snider also challenges the subject matter jurisdiction of the circuit court over the issues of spousal support and the equitable distribution of the marital property. Whether a court has subject matter jurisdiction over an issue is a question of law which may be raised at any point in the proceedings. *See* Syllabus Point 1, *Hinkle v. Bauer Lumber & Home Bldg. Center, Inc.*, 158 W.Va. 492, 211 S.E.2d 705 (1975) ("Whenever it is determined that a court has no jurisdiction to entertain the subject matter of a civil action, the forum court must take no further action in the case other than to dismiss it from the docket.")

*W.Va.Code*, 48–2–15 [1999] sets forth various types of relief which circuit courts may grant to parties as a part of a divorce. *W.Va.Code*, 48–2–15(a) states, in part, that:

> Upon ordering a divorce ... the court may require either party to pay alimony in the form of periodic installments, or a lump sum, or both, for the maintenance of the other party.

Furthermore, *W.Va.Code*, 48–2–15(b) states, in part, that:

> Upon ordering ... a divorce ... the court may further order all or any part of the following relief: ...
>
> (7) When the pleadings ... raise issues concerning the equitable distribution of marital property ... the court shall order such relief as may be required to effect a just and equitable distribution of the property and to protect the equitable interests of the parties therein; ....

Mr. Snider argues that, under *W.Va. Code*, 48–2–15, West Virginia courts are only empowered to grant relief "upon ordering a divorce"—and conversely, he argues they cannot grant relief when a foreign jurisdiction, which has jurisdiction over the marriage and personal jurisdiction over one party, grants the party an *ex parte* divorce. In other words, he argues that because the Illinois action was filed first, and the Illinois court issued an order dissolving the parties' marriage first, the Illinois court deprived our courts of all authority to adjudge Ms. Snider's personal rights. In essence, Mr. Snider is arguing that, because he filed his action in Illinois first, Ms. Snider is now compelled to travel to the foreign jurisdiction and submit to its laws and authority to obtain any relief. We disagree.

The consequence of accepting Mr. Snider's position would be that our State, where Ms. Snider is domiciled and where the parties ostensibly maintained their marriage, would be forced by a foreign jurisdiction to abdicate its interest in protecting its own residents—married or otherwise. Furthermore, Ms. Snider would be placed in a manifestly unfair predicament:

On the one hand, she may submit to the jurisdiction of a foreign court, where, as an out-of-state defendant, she is under a distinct disadvantage in seeking to recover alimony. On the other hand, she can disregard the foreign action altogether, thereby foregoing all right to alimony payments in the state of her domicile. Putting any spouse to such a choice is palpably unconscionable.

*Altman v. Altman,* 282 Md. 483, 493, 386 A.2d 766, 772 (1978) (citations omitted).

The seminal case which generally guides our decision is *Vanderbilt v. Vanderbilt,* 354 U.S. 416, 77 S.Ct. 1360, 1 L.Ed.2d 1456 (1957). In *Vanderbilt,* the parties were married and lived in California, where they separated in 1952. The wife moved to New York, and in 1953, the husband received a decree of divorce in Nevada which provided that both husband and wife were "freed and released from the bonds of matrimony and all duties and obligations thereof . . . ." The wife was not served with process in Nevada, did not appear in the proceedings, and it was agreed that the Nevada courts could not constitutionally assert personal jurisdiction over the wife.

In 1954, the wife brought suit in New York seeking alimony. The New York court found the Nevada divorce decree to be valid and enforceable insofar as it dissolved the marriage, under the Full Faith and Credit Clause (Article IV, section 1) of the *United States Constitution.* However, the New York court directed the husband to make support payments to the wife. As in the instant case, the husband appealed, arguing that the Nevada divorce decree had terminated the wife's right to seek any relief under any other state's laws.

On appeal by the husband, the United States Supreme Court affirmed New York's award of alimony to the wife. The Court concluded that because Nevada did not have personal jurisdiction over the wife, the Nevada courts had no power to extinguish any right to financial support that the wife had under the law of New York. The Court stated that:

Since the wife was not subject to its jurisdiction, the Nevada divorce court had no power to extinguish any right which she had under the law of New York to financial support from her husband. It has long been the constitutional rule that a court cannot adjudicate a personal claim or obligation unless it has jurisdiction over the person of the defendant. Here the Nevada divorce court was as powerless to cut off the wife's support right as it would have been to order the husband to pay alimony if the wife had brought the divorce action and he had not been subject to the divorce court's jurisdiction. Therefore, the Nevada decree, to the extent it purported to affect the wife's right to support, was void and the Full Faith and Credit Clause did not obligate New York to give it recognition.

*Vanderbilt,* 354 U.S. at 418–19, 77 S.Ct. at 1362–63, 1 L.Ed.2d at 1459 (footnotes omitted). Based upon *Vanderbilt,* we can discern a general rule that personal rights, which include property and support rights in domestic relations cases, may not be adjudicated or extinguished by a court lacking personal jurisdiction over a defendant.

It does not appear from the record that the Illinois court could assert personal jurisdiction over Ms. Snider, and Mr. Snider's counsel makes no argument that it could. While we must give full faith and credit to the Illinois decree insofar as it terminates the marriage of the parties, we hold that the Illinois court was without power to adjudicate the issues of spousal support and the equitable distribution of the parties' marital property. The question remains, however, whether our courts, under *W.Va.Code,* 48–2–15, have the authority to adjudicate those issues.

The Supreme Court of Virginia, in 1978, examined a situation substantially similar to the case at hand, and applying a statute similar to *W.Va.Code,* 48–2–15, concluded that spousal support and property rights are legal obligations which survive an *ex parte* foreign divorce decree. In *Newport v. Newport,* 219 Va. 48, 49, 245 S.E.2d 134, 135 (1978), the court applied a statute which stated:

Upon decreeing the dissolution of a marriage, and also upon decreeing a divorce ... the court may make such further decree as it shall deem expedient concerning the estate and the maintenance and support of the parties, or either of them....

The court concluded that a divorce decree issued in Nevada would not prevent the wife from seeking maintenance and support from a court in the parties' home state of Virginia. The court applied *Vanderbilt* to conclude that the foreign state's decree did not terminate the wife's statutory right to support from her husband, and that the wife could bring her claim for support in a Virginia court. *See also Gibson v. Gibson*, 5 Va.App. 426, 364 S.E.2d 518 (1988) (divorce decree obtained by husband *ex parte* from a Tennessee court did not preclude a Virginia court from awarding wife spousal support).

■ The position urged by the appellant—that we construe *W.Va.Code*, 48–2–15 in a manner that allows an *ex parte* foreign divorce decree to oust West Virginia courts of authority to address unresolved domestic relations issues arising within its borders— would produce an absurd and unfair predicament for West Virginia domiciliaries. Such a construction would force West Virginia domiciliaries to submit to the personal jurisdiction of a foreign state to resolve their personal and property rights, or forever waive those rights. "Where a particular construction of a statute would result in an absurdity, some other reasonable construction, which will not produce such absurdity, will be made." Syllabus Point 2, *Newhart v. Pennybacker*, 120 W.Va. 774, 200 S.E. 350 (1938). "It is as well the duty of a court to disregard a construction, though apparently warranted by the literal sense of the words in a statute, when such construction would lead to injustice and absurdity." Syllabus Point 2, in part, *Click v. Click*, 98 W.Va. 419, 127 S.E. 194 (1925).

■ We adopt the reasoning of our sister state and apply it to *W.Va.Code*, 48–2–15. We hold, therefore, that under the divisible divorce doctrine, where a foreign jurisdiction does not have personal jurisdiction over both parties to a marriage, the personal and property rights of the parties may be litigated in West Virginia separately from a divorce decree issued in another jurisdiction. Spousal support and marital property rights, available under *W.Va.Code*, 48–2–15 survive such an *ex parte* foreign divorce decree when the foreign court did not have personal jurisdiction over the defendant in the foreign proceeding.[5]

In sum, we conclude that the family law master and the circuit court properly asserted jurisdiction over the parties, and properly asserted jurisdiction over the spousal support for Ms. Snider and the equitable distribution of the parties' marital property.[6]

5. It appears that most states that have considered this question have similarly ruled that an *ex parte* foreign divorce decree does not terminate the right of a state having jurisdiction over both parties to adjudicate rights incidental to the marriage. *See, e.g., Haeuser v. Haeuser*, 200 Wis.2d 750, 548 N.W.2d 535 (1996); *Poston v. Poston*, 160 Vt. 1, 624 A.2d 853 (1993); *Altman v. Altman*, 282 Md. 483, 386 A.2d 766 (1978); *Maguire v. Maguire*, 45 A.D.2d 98, 100, 356 N.Y.S.2d 125, 126–127 (1974) ("[I]t is well settled that a wife may apply for and be granted support even after her husband has obtained an *ex parte* foreign divorce."); *Harrod v. Harrod*, 34 Colo.App. 172, 526 P.2d 666 (1974) *Foss v. Foss*, 83 S.D. 574, 163 N.W.2d 354 (S.D.1968); *Hudson v. Hudson*, 52 Cal.2d 735, 344 P.2d 295, 300–301 (1959); *King v. King*, 185 Kan. 742, 347 P.2d 381, 388 (1959); *Seely v. Seely*, 348 P.2d 1064, 1066 (Okl. 1959); *White v. White*, 83 Ariz. 305, 309, 320 P.2d 702, 704 (1958) ("We do not believe the legislature ever intended the wife's rights under such statute should be abrogated merely because the husband won out in the race to have his decree entered first."); *Malcolm v. Malcolm*, 345 Mich. 720, 76 N.W.2d 831, 834 (1956); *Hopson v. Hopson*, 95 U.S.App.D.C. 285, 221 F.2d 839, 847 (1955); *Sorrells v. Sorrells*, 82 So.2d 684, 686 (Fla.1955); *Armstrong v. Armstrong*, 162 Ohio St. 406, 123 N.E.2d 267, 269 (1954), *aff'd*, 350 U.S. 568, 76 S.Ct. 629, 100 L.Ed. 705 (1956); *Taylor v. Taylor*, 242 S.W.2d 747, 749 (Ky.1951); *Rice v. Rice*, 213 Ark. 981, 214 S.W.2d 235, 239 (1948); *Ische v. Ische*, 252 Wis. 250, 31 N.W.2d 607, 613 (1948); and *Nelson v. Nelson*, 71 S.D. 342, 24 N.W.2d 327, 329 (1946).

We note that Mr. Snider's home state of choice, Illinois, also recognizes that an *ex parte* divorce obtained in a foreign jurisdiction by one spouse, "although regarded as a valid determination of the parties' capacity to remarry, does not have the effect of terminating [the other spouse's] right to support." *Pope v. Pope*, 2 Ill.2d 152, 154, 117 N.E.2d 65, 66 (1954).

6. Mr. Snider raises several additional points of error in his brief, primarily centered upon the valuation of marital property, the amount of ali-

## IV.

### Conclusion

The January 28, 2000 order of the Circuit Court of Harrison County is affirmed.

Affirmed.

mony awarded to Ms. Snider, and the amount of attorney's fees which he was required to pay on Ms. Snider's behalf. An examination of the record, however, suggests that Mr. Snider failed to provide discovery of his income, and is currently the subject of three contempt petitions because of his actions during the litigation of the case below, all unresolved. We are also perplexed that Mr. Snider can afford three attorneys for the instant appeal, while simultaneously claiming an inability to pay Ms. Snider's attorney's fees or meet his alimony obligations. On this record, we decline to examine Mr. Snider's contentions.

In her detailed brief to this Court, Ms. Snider, acting *pro se*, has cross-appealed numerous factual determinations made by the family law master and adopted by the circuit court. After examining the record, we similarly decline to examine Ms. Snider's factual contentions.