IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

FILED
April 29, 2025

ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

IN RE: R.K., a minor,

No. 24-ICA-349   (Fam. Ct. Marion Cnty. Case No. FC-24-2020-FIG-17)

MEMORANDUM DECISION

Petitioner Peter K. ("Father")[1] appeals the Family Court of Marion County's August 5, 2024, order that denied his Petition to Modify Guardianship. Respondent Megan M., the court appointed guardian of the child, filed a response in support of the family court's order.[2] Respondent Sarah K. ("Mother") did not participate in this appeal. Father did not file a reply.

This Court has jurisdiction over this appeal pursuant to West Virginia Code § 51-11-4 (2024). After considering the parties' arguments, the record on appeal, and the applicable law, this Court finds that there is error in the family court's decision. For the reasons set forth below, a memorandum decision vacating the family court's decision and remanding for further proceedings is appropriate under Rule 21 of the Rules of Appellate Procedure.

Father and Mother are the biological parents of one child, who was born in February 2014. On October 19, 2020, Mother was arrested and charged with possession with the intent to deliver heroin.[3] On October 21, 2020, Respondent Megan M., who is the child's maternal aunt, filed a Petition for Appointment of Guardian of the child in the Family Court of Marion County, asking the court to appoint her as the child's legal guardian. In support

---

[1] To protect the confidentiality of the juveniles involved in this case, we refer to the parties' last name by the first initial. *See, e.g.*, W. Va. R. App. P. 40(e); *State v. Edward Charles L.*, 183 W. Va. 641, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990).

[2] Father is represented by Amy L. Lanham, Esq. Megan M. is represented by Alyson A. Dotson, Esq.

[3] The record indicates that Mother was also charged with conspiracy to violate felony drug laws on December 7, 2020. On August 24, 2021, Mother pled guilty to both counts pursuant to a plea with an agreement for deferred adjudication. Seven days after her plea, Mother violated the terms of her deferred adjudication by testing positive for buprenorphine, fentanyl, and methamphetamine. Thereafter, she began the adult treatment court program but was expelled from the program for drug use in August of 2022.

of her petition, Megan M. stated that the reason for the guardianship was "[f]or mom and dad to seek addiction counseling and permit time to resolve criminal cases." Father and Mother executed Waivers of Guardian Appointment, consenting for Megan M. to be appointed as their child's guardian. On October 30, 2020, after holding a hearing on the petition, the family court entered an order appointing Megan M. as the child's legal guardian.[4]

Approximately seven months later, in May of 2021, Father filed a petition to terminate the guardianship and regain custody of the child. The family court ordered the parents to submit to random drug screens. The record reflects that the court ordered Father to randomly screen twice in June of 2021, and that he tested negative for all screened substances both times. On June 25, 2021, Father filed a motion asking the family court to appoint a guardian ad litem for the child, which the court denied by order entered June 29, 2021.

Also on June 25, 2021, Father filed another petition to terminate the guardianship and regain custody of the child.[5] In his petition, Father alleged that he was "high on drugs" when he signed the Waiver of Guardian Appointment, believed that the guardianship was temporary, and that he would regain custody of his child after he became sober. Father maintained that he completed addiction counseling, never had any criminal issues to resolve, that Megan M. refused to communicate with him about the child, and that he had no contact with the child.

On August 12, 2021, and September 13, 2021, the family court held hearings on Father's petition to terminate the guardianship. By order entered September 14, 2021, the court denied Father's May of 2021 petition to terminate the guardianship. In this order, the family court found the following: the child began seeing Dr. Judith Black for therapy in October 2020; Dr. Black testified that the child was left home alone and felt unsafe the majority of the time after his parents began using drugs; the child told Dr. Black that before the guardianship he hid in the closet to feel safe, slept with a gun by his bed to protect himself from the "bad guys", who were drug dealers, and was locked in the home while Father was with friends in the garage; several witnesses testified that Father was a good parent before he became addicted to drugs; the parents' drug addiction took a severe emotional toll on the child; after the guardianship, the child asked to have his bed

---

[4] Neither the transcript nor the recording from the initial guardianship hearing was provided to this Court on appeal.

[5] While not entirely clear from the record, it appears that Father filed his May of 2021 petition before he retained counsel and the June 25, 2021, petition was filed by his attorney.

positioned so he could see Megan M. while he slept and wanted cameras around the house in case the "bad guys" came; Father is now sober and free from all drugs; and Dr. Black was clear that it is not in the child's best interest for Father to regain custody.[6]

Additionally, the court found that it would only entertain another petition to terminate the guardianship filed by Father if he successfully completed the four following prerequisites: "a. Random urine and hair follicle drug testing; b. Individual counseling; c. Family psychotherapy sessions with the child and Dr. Black (his counselor); [and] d. A recommendation from Dr. Black that the child is ready to return to care, custody, and control of the Father[.]"

On January 13, 2022, Father filed a renewed motion to terminate the guardianship, which was dismissed on May 26, 2022, for failure to perfect service. However, on June 10, 2022, Father filed another petition to terminate the guardianship, which was denied by order entered October 6, 2022. In this October 6, 2022, order, the court discussed the four prerequisites that it had previously ordered Father to complete. The court found the following: that Father's results for the hair follicle and random drug screens were negative for all substances; that Father had attended outpatient therapy for sixty days; that Father testified that he had attempted to contact Dr. Black on several occasions and that she never returned his calls; that Father had submitted to a parental fitness evaluation with Dr. Edward Baker, a psychologist, and that Dr. Baker administered a Child Abuse Potential Inventory ("CAPI") test to Father; that Father does not assume responsibility for the child's trauma; that Dr. Black testified that the child is triggered because he believes he may be left by someone important in his life; and that Father complied with the court's prior order. Specifically, the court found that while "Father complied with the [c]ourt's prior [o]rder in principle," it did "not believe he complied with the spirit of the [o]rder." The family court explained that while Father was compliant with the court's previous order by attending counseling for sixty days, the court's "greatest concern" was "Father's failure to maintain counseling." The court found that although Father attended counseling for sixty days, "it [wa]s unclear if any progress was made[,]" and that Father did not schedule any further sessions.

In support of its denial of Father's renewed motion to terminate the guardianship, the family court found that the fourth prerequisite, a recommendation from Dr. Black that

---

[6] Megan M. submitted Dr. Black's report and recommendation into the record during the family court's September 13, 2021, hearing. Dr. Black's report stated that the child was born addicted to drugs, stayed with family members for the seven years of his life due to his parents' drug addiction, had been left alone multiple times by his parents, and had found drugs in the house. Because the experiences the child shared from living with his parents placed him in danger, Dr. Black was concerned that the parents threatened the child's overall well-being and recommended the child remain with Megan M.

3

the child was ready to return to Father's care, was not achieved. The court found that reunification therapy was not in the child's best interest pursuant to Dr. Black's opinion, and that although the court does not intend to "create hoops through which the Father must jump[,]" the child was "very traumatized by his living situation" with his Father, and it would "jeopardize the welfare of the child by returning him to his [F]ather before those issues are resolved." The court ordered Father to continue individual therapy to address issues of substance abuse, substance abuse prevention, and the actions which led to the child's trauma, and that involving the child in family therapy with Father would be contingent upon Dr. Black and Tammy Hamner, a co-parent counselor, both consenting. The court ordered Father to refrain from filing another petition without a recommendation from Dr. Black opining that it was in the child's best interest to begin the process of reunification therapy.

On October 23, 2022, Megan M. filed a petition for contempt because Father had appeared at the child's football game and made direct contact with the child on at least two occasions. By order entered December 7, 2022, the family court held Father in contempt of the October 6, 2022, order and ordered that he was to have "absolutely no contact with the child, directly or indirectly, outside of a therapeutic setting." The court ordered that Father was prohibited from any contact with the child until Dr. Black and Ms. Hamner had jointly decided that it was appropriate to bring the child into therapy sessions with Father.

On January 30, 2024, Father filed a Petition to Modify Guardianship, which requested the family court to modify its October 6, 2022, and December 7, 2022, orders.[7] Father's petition asked the family court to immediately start reunification between him and the child. In support of his petition and to prove there had been a change of circumstances to warrant to modification, Father asserted the following: that he attended individual counseling sessions; that he continued to test negative for drugs pursuant to the court's drug screen orders; that he underwent a psychological evaluation as ordered by the court; that he completed family counseling with Ms. Hamner; that the parties had agreed that visitation with the child needed to begin; that Ms. Hamner had emailed Dr. Black regarding these visits and that Dr. Black had refused to respond; that Dr. Black refused to cooperate with the reunification process between Father and the child; that Father had followed all recommendations and requirements of the family court; and that reunification with the child was in the child's best interest. Father also requested that the court order a

_____

[7] On February 5, 2024, Mother moved for visitation with the child. Mother asserted that she asked Megan M. to become the child's guardian while she handled legal troubles and addiction. Mother was incarcerated at the beginning of these proceedings, placed on home confinement in December of 2022, and was released in May of 2024. She contended that since she had successfully completed substance abuse treatment and passed random drug screens for over a year that there had been a substantial change in circumstances to warrant the modification.

psychological evaluation to be performed on the child separate from the child's therapy so that a neutral third party could evaluate the child because Dr. Black had no intentions of reunifying the child with Father.

On May 28, 2024, and July 30, 2024, the family court held final hearings on Father's petition. Testimony revealed that Mother and Father initiated the minor guardianship because of their substance abuse and Mother's drug charges. Mother testified that since Child Protective Services ("CPS") was going to take the child, she, Father, and Megan M. met with Megan M.'s attorney to sign the waivers consenting to the guardianship.[8] Mother explained that the child was sometimes present when she and Father used and sold drugs in the home and that she was in no condition to take care of the child when the guardianship was filed. Dr. Black testified that the guardianship was initiated because "[t]he child was not safe in the home" because of drug abuse and potential criminal charges. Dr. Black testified that the child was traumatized prior to residing with Megan M. and that Father triggered the child's trauma.

On August 5, 2024, the family court entered an order denying Father's petition. The court found that all of Father's drug screens throughout the entirety of the proceedings were negative, and discussed the testimony and recommendations of different counselors, therapists, and doctors. The court found, among other things, the following: the child had experienced trauma prior to the guardianship being filed; Mother and Father were equally involved in using and selling drugs; that the parents had agreed that Mother would fully take the blame if they were ever caught; some drug deals took place with the child present in the home; Father faced no consequences for his drug involvement; testimony indicated that Father had not discussed accepting responsibility for his actions that prompted the child being placed in Megan M.'s care; Father's CAPI test scores were not valid due to his failure to admit faults; Dr. Black opined that Father was a trauma trigger for the child; Dr. Baker recommended that Father be given supervised visits with the child; Ms. Hamner opined that the process of reunifying Father and the child should begin; Ms. Rush, Father's individual therapist, does not believe that Father exhibits narcissistic traits and has the ability to control himself; Ms. Rush, her staff, and previous therapists attempted to contact Dr. Black, but Dr. Black had not responded to them; Dr. Black opined that a psychological evaluation of the child could be detrimental to the child; and Dr. Black did not believe reunification between Father and the child was in the child's best interest. The court also found that Mother and Father had done well and had materially changed their individual circumstances, but that Father continuously failed to comply with Dr. Black's recommendations.

The family court then ordered each parent to draft an apology letter to the child and to follow the recommendations in Dr. Black's May 23, 2024, report. Specifically, the court

---

[8] Megan M.'s attorney below is not her attorney on appeal.

ordered that once the child read Mother's apology letter, "Mother shall begin video communication with the child" and once the child read Father's apology letter, "any further engagement" with Father "should be carefully evaluated and collaboratively decided upon with the child and his support system, within the therapeutic context." It is from this order that Father now appeals.

On appeal, Father presents four assignments of error. First, Father argues that the family court did not have jurisdiction to consider the minor guardianship petition because the basis of the initial guardianship petition was due to child abuse and neglect allegations. Second, Father asserts that the court abused its discretion by not allowing Father at least therapeutic visitation with the child. Third, Father contends that the court erroneously found that there was not a conflict of interest for Dr. Black, who is Megan M.'s therapist, to also counsel the child and erred by basing its decision solely on Dr. Black's recommendations. Lastly, Father insists that the court abused its discretion by denying Father any contact with the child because the guardianship was initiated so that the parents could resolve their addiction issues and legal trouble, which have since been remedied.

When reviewing the order of a family court, we apply the following standard of review:

> When a final order of a family court is appealed to the Intermediate Court of Appeals of West Virginia, the Intermediate Court of Appeals shall review the findings of fact made by the family court for clear error, and the family court's application of law to the facts for an abuse of discretion. The Intermediate Court of Appeals shall review questions of law de novo.

Syl. Pt. 2, *Christopher P. v. Amanda C.*, 250 W. Va. 53, 902 S.E.2d 185 (2024); *accord* W. Va. Code § 51-2A-14(c) (2005) (specifying standards for appellate court review of family court orders).

The critical issue before this Court is whether the family court had subject matter jurisdiction to consider the minor guardianship petition under Rule 13 of the Rules of Practice and Procedure for Minor Guardianship Proceedings and Rule 48a of the Rules of Practice and Procedure for Family Court.[9] The Supreme Court of Appeals of West Virginia has stated that,

> "[i]t is well established that the issue of subject matter jurisdiction can be raised at any time, even *sua sponte* by this Court." *State ex rel. Universal Underwriters Ins. Co. v. Wilson*, 239 W. Va. 338, 345, 801 S.E.2d 216, 223

---

[9] Because these rules are duplicative and contain the same language, this decision refers to them as Rule 48a and Rule 13 for ease of reference.

6

(2017). "Whether a court has subject matter jurisdiction over an issue is a question of law[.]" *Snider v. Snider*, 209 W. Va. 771, 777, 551 S.E.2d 693, 699 (2001). Because "jurisdictional issues are questions of law, our review is de novo." *Wilson,* 239 W. Va. at 343, 801 S.E.2d at 221 (citing Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995)).

*M.H. v. C.H.*, 242 W. Va. 307, 311-312, 835 S.E.2d 171, 175-176 (2019). Subject-matter jurisdiction must exist as a matter of law for a court to act; consequently, any decree made by a court lacking subject-matter jurisdiction is void. *See A.A. v. S.H.*, 242 W. Va. 523, 535 n.44, 836 S.E.2d 490, 502 n.44 (2019).

In support of his first assignment of error, Father argues that since the guardianship was initiated by fear that CPS was going to remove the child from the home due to drug issues, the allegations required the family court to remove the case to circuit court under the rules. Father asserts that Megan M.'s initial guardianship petition explicitly included abuse and neglect allegations as being the basis for the petition by stating that the reason for the guardianship was "[f]or mom and dad to seek addiction counseling and permit time to resolve criminal cases." We find merit in this argument.

The Supreme Court of Appeals of West Virginia ("SCAWV") "has promulgated the West Virginia Rules of Practice and Procedure for Minor Guardianship Proceedings, and the Legislature has commanded that '[a]ll proceedings [on a minor guardianship petition] shall be conducted in accordance with' these rules." *M.H.*, 242 W. Va. at 312, 835 S.E.2d at 176 (citing W. Va. Code § 44-10-3(c)).

Rule 2(a)(2) of the Rules of Practice and Procedure for Minor Guardianship Proceedings establishes that "family court jurisdiction in minor guardianship proceedings is subject to removal under the conditions set forth in Rule 13 of these rules[.]" *See also In re Guardianship of K.W.*, 240 W. Va. 501, 508, 813 S.E.2d 154, 161 (2018) ("[T]he family court and circuit court have concurrent jurisdiction in guardianship matters pursuant to Rule 2 of the Minor Guardianship Rules, but, as explained in that rule, the family court's jurisdiction is subject to the removal provisions in Rule 13."). Rule 13 states the following:

> If a family court learns that the basis, in whole or part, of a petition for minor guardianship brought pursuant to W.Va. Code § 44-10-3, is an allegation of child abuse and neglect as defined in W.Va. Code § 49-1-201, then the family court before whom the guardianship proceeding is pending *shall remove* the case to the circuit court for hearing. Should the family court learn of such allegations of child abuse and neglect during the hearing, then the family court *shall* continue the hearing, subject to an appropriate temporary guardianship order, and *remove* the case to the circuit court for hearing to be conducted within 10 days, for determination of all issues. Once removed, the case (or any portion) shall not be remanded to family court.

7

W. Va. R. Prac. & P. Min. Guard. R. 13(a) (emphasis added). Rule 48a necessitates removal under the same circumstances and is a mirror image of Rule 13(a).[10] "It is well established that the word 'shall,' in the absence of language . . . showing a contrary intent . . . , should be afforded a mandatory connotation." Syl. Pt. 1, *Nelson v. W. Va. Pub. Emps. Ins. Bd.*, 171 W. Va. 445, 300 S.E.2d 86 (1982).

The question then becomes whether the family court was confronted with a minor guardianship petition based "in whole or part" on "an allegation of child abuse and neglect as defined in West Virginia Code § 49-1-201[.]" W. Va. R. Prac. & P. Min. Guard. 13(a). "Child abuse and neglect" is defined as "any act or omission that creates an abused child or a neglected child as those terms are defined in [West Virginia Code § 49-1-201]." *See In re F.W.*, No. 20-0167, 2020 WL 6482851, at *5 (W. Va. Nov. 4, 2020) (memorandum decision).

West Virginia Code § 49-1-201 (2018) states that the "terms defined in this section have the meanings ascribed to them that relate to, but are not limited to, child abuse and neglect[.]" A neglected child "means a child . . . [w]hose physical or mental health is harmed or threatened by . . . failure or inability of the child's parent . . . to supply the child with necessary food, clothing, shelter, supervision . . ." *Id*. "Imminent danger to the physical well-being of the child" is defined as

> an emergency situation in which the welfare . . . of the child is threatened. These conditions may include an emergency situation when there is . . . reasonable cause to believe that the following conditions threaten the health, life, or safety of any child in the home: . . . [t]he parent, guardian, or custodian's abuse of alcohol or drugs or other controlled substance . . . has impaired his or her parenting skills to a degree as to pose an imminent risk to a child's health or safety.

*Id*.

In her response brief to this Court, Megan M. acknowledges that the record reflects that an abuse and neglect proceeding would have likely been initiated due to Mother's criminal activity had the parents not consented to the guardianship. However, Megan M. maintains that the allegations of abuse and neglect were never presented to the family court because the parents purposefully omitted such information. Upon review, the initial petition stated that the purpose of the guardianship was "[f]or mom and dad to seek addiction counseling and permit time to resolve criminal cases." Further, not only did the

---

[10] We note that Rule 48a's reference to "W. Va. Code § 49-1-3" is now incorrect since it was recodified in 2015 as West Virginia Code § 49-1-201 (2018). With this correction, Rule 48a and Rule 13 are, in all relevant aspects, indistinguishable.

family court begin ordering Mother and Father to submit to random drug screens in as early as June of 2021, but it also made explicit findings in its June 25, 2021, order how the parents' addiction had threatened the child's well-being. The court analyzed Dr. Black's testimony and recommendation, expressing that the parents' drug addiction caused the child to be left home alone, caused the child to hide in a closet and sleep near a gun to feel safe, and ultimately threatened the emotional well-being of the child. While Father had passed every drug screen, and the court commended him for being sober, the court also continuously prohibited Father from having any contact with the child. It is apparent that the court's consideration of Megan M.'s allegations of child neglect by Father led to the court's determination denying Father from having any visitation or contact with the child.

Further, in its October 6, 2022, order, the family court addressed the neglect allegations, finding that the child suffered trauma while living with Father, that returning the child to Father would *jeopardize the child's welfare*, and that Father did not take responsibility for anything that happened to the child prior to the guardianship. Likewise, the August 5, 2024, order also found that testimony indicated that Father had never discussed his responsibility for actions which caused the child to be placed in the guardianship.

Additionally, during the May 28, 2024, hearing, Mother testified that the basis for the guardianship was because "CPS was getting involved, and he was about to be taken." In its August 5, 2024, order, the court found that the parents were using and selling drugs out of their home, with the child being present during some of those occasions. Megan M. appears to argue that because these allegations were not as apparent at the initial filing and were only made known to the family court after Megan M. was appointed as the child's guardian, the family court acted properly. However, it is well established that "[a]mong such limits imposed upon a family court's jurisdiction are the inability of a family court to hear a matter involving child abuse or neglect insofar as such cases are within the exclusive authority of the circuit court . . . ." *In the Interest of J.L., Jr.*, 234 W. Va. 116, 120, 763 S.E.2d 654, 658 (2014).

In *A.A. v. S.H.*, 242 W. Va. 523, 836 S.E.2d 490 (2019), the SCAWV vacated a family court's guardianship order because it did not have subject matter jurisdiction due to abuse and neglect allegations. *A.A. v. S.H.*, 242 W. Va. 523, 524-525, 836 S.E.2d 490, 491-492 (2019). There, the family court granted guardianship to a grandmother because the father consented, and the mother was incarcerated at the time. *Id*. at 528, 836 S.E.2d at 495. Upon mother's release from jail, she filed a petition to modify or terminate the guardianship. *Id*. at 529, 836 S.E.2d at 496. The family court denied mother's motion and request for visitation, finding that she had no home fit for children, no transportation, no job, and nothing to make the court believe she was stable. *Id*. at 531, 836 S.E.2d at 498. The circuit court upheld the family court's ruling. *Id.* On appeal, the SCAWV found that Rule 48a and Rule 13 necessitated the family court's removal of the case to circuit court. *Id*. at 533, 836 S.E.2d at 500. The Court explained that considering a child's need for

permanency, when a guardianship is based on allegations of neglect, parental rights need to be ascertained under Chapter 49 of the West Virginia Code in circuit court. *Id.* at 535, 836 S.E.2d at 502.

Here, while the family court was rightfully concerned with assuring the child's safety, it is evident from the initial petition that Megan M. sought guardianship of the child due to neglect allegations. Megan M. alleged that the parents were unable to care for the child on account of their addiction and criminal matters.[11] Thus, upon our review of the record, there is no question that the allegations of neglect made by Megan M. were sufficient to require the family court to remove the case to circuit court under Rule 48a and Rule 13. As such, we conclude that the family court had no jurisdiction to act on the minor guardianship petition since the initial petition was based, in part, on allegations of child neglect. Additionally, it is apparent that the family court's rulings continuously prohibiting Father from any type of contact with the child throughout the entirety of the proceedings were based upon the neglect allegations. While the basis for the guardianship petition should have been apparent on its face, the family court undoubtedly realized the reasoning for the petition during subsequent pleadings and hearings. Because the family court was without subject matter jurisdiction to act in this case, we conclude that Father's remaining assignments of error are moot.

For the foregoing reasons, we vacate the family court's August 5, 2024, order, and remand this matter to the family court to enter an order removing the case to the circuit court within ten days of entry of this decision. We convert the August 5, 2024, order into

---

[11] While substance abuse, standing alone, may not be sufficient to adjudicate a parent in an abuse and neglect proceeding, that is not within our jurisdiction to determine, as this Court has no jurisdiction over child abuse and neglect proceedings. *See* W. Va. R. App. P. 1(b). However, the SCAWV has considered a plethora of cases where parental rights were terminated because a child was abused or neglected due to a parent's substance abuse. *See In Re H.C.*, No. 12-0471, 2012 WL 4838995 (W. Va. September 24, 2012) (memorandum decision) (Because of the father's substance abuse, the children's health was harmed by his failure to supply them with necessary supervision.); *In re Aaron Thomas M.*, 212 W. Va. 604, 575 S.E.2d. 214 (2002) (Mother's repeated use of controlled substances in front of her three children constituted emotional "abuse" of the children for purposes of adjudicating the children as abused and/or neglected.); *In re Dejah P.*, 216 W. Va. 514, 607 S.E.2d 843 (2004) (Mother's parental rights were terminated due to her drug addiction.); *In re F.W.*, No. 20-0167, 2020 WL 6482851, at *5 (W. Va. Nov. 4, 2020) (memorandum decision) (Termination of father's parental rights was proper where substance abuse resulted in his repeated incarcerations and inability to care for his children.)

a temporary order and direct that the child remain in Megan M.'s care pending the circuit court's determination.

Vacated and Remanded.

**ISSUED:** April 29, 2025

**CONCURRED IN BY:**

Chief Judge Charles O. Lorensen
Judge Daniel W. Greear
Judge S. Ryan White