575 S.E.2d 94

**Nancy L. ELLITHORP, Plaintiff Below, Appellee**

v.

**Gary Dean ELLITHORP, Defendant Below, Appellant**

**No. 30443.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 18, 2002.

Decided Oct. 11, 2002.

Dissenting Opinion of Chief Justice Davis Nov. 22, 2002.

for the West Virginia Department of Health & Human Resources Bureau for Child Support Enforcement.

Roger D. Williams, James F. Humphreys & Associates, Charleston, West Virginia, Attorney for the Appellant.

PER CURIAM:

Appellant Gary Dean Ellithorp appeals from the June 28, 2001, order of the Circuit Court of Putnam County affirming the family law master's recommended order for entry of a decretal judgment arising from an arrearage for both child support and alimony. While the underlying proceedings relative to the divorce and establishment of child support and alimony were protracted and involved conflicting rulings due to the initiation of simultaneous divorce proceedings in Texas and West Virginia, the sole matter raised by Appellant is whether the lower court erred in ruling that Appellant's consent to an agreed order entered by the circuit court in February 1997 retroactively conferred jurisdiction necessary to enforce the support provisions of a West Virginia divorce decree that was entered in May 1995 without personal jurisdiction over Appellant. Upon our full and considered review of this matter, we affirm, in part, and reverse, in part.

## I. Factual and Procedural Background

Appellant and Nancy L. Ellithorp, Appellee, were married in 1980 in the state of Ohio. Two children were born of the marriage: John and Daniel.[1] The parties moved to West Virginia in 1990 where they jointly resided until Appellant enlisted in the armed forces in June 1993. At the time of the parties' date of legal separation on May 7, 1994, Appellant was stationed in Texas.

Appellee instituted a divorce proceeding in the Circuit Court of Putnam County, West Virginia, on July 21, 1994. She averred in the divorce complaint that Appellant was stationed in El Paso, Texas, as a member of the armed forces of this country, but that he maintained his legal residence in Putnam County. Appellee attempted service of the complaint upon Appellant through the West

Rachel Fletcher, Rochelle Goodwin, Bruce G. Perrone, Legal Aid of West Virginia, Charleston, West Virginia, Attorneys for the Appellee, Nancy L. Ellithorp.

Kimberly D. Bentley, Assistant General Counsel, Charleston, West Virginia, Attorney

---

1. John was born on July 14, 1982, and Daniel was born on March 24, 1988.

Virginia Secretary of State, but Appellant refused to accept delivery of the divorce papers and he filed no response to the West Virginia divorce proceedings.

Five days after Appellee initiated the divorce action in this state, Appellant filed for divorce in El Paso County, Texas.[2] When the West Virginia family law master contacted the Texas court to inform it of the pending West Virginia divorce action,[3] the Texas court refused to defer jurisdiction to the West Virginia court.[4] Following a hearing before the West Virginia Family Law Master on December 19, 1994, to determine whether the action should proceed in West Virginia, the law master signed an order on December 22, 1994, which included the following findings: (1) that the children of the parties were continuous bona fide residents of Putnam County, West Virginia; (2) that West Virginia had jurisdiction under the Uniform Child Custody Jurisdiction Act; and (3) that "West Virginia shall maintain the jurisdiction of the complaint filed in Putnam County as to all issues and, specifically the infant children."[5]

On January 13, 1995, the Texas court issued a Final Decree of Divorce[6] in which the parties were appointed as "joint managing conservators" of the children. Under the Texas final decree, Appellee was designated as the primary managing conservator and awarded child support of $400 per month until "any child reaches the age of 18 years."[7]

A final hearing of divorce was held by the family law master in West Virginia on January 3, 1995, and an order was prepared recommending divorce on the grounds of adultery and irreconcilable differences. Because Appellee had not alleged irreconcilable differences in her complaint, the circuit court remanded the matter to the family law master. Following the submission of a second recommended order,[8] which identified adultery as the only ground for the divorce, the circuit court entered a final order of divorce on May 11, 1995. Under the West Virginia final order of divorce, Appellee received custody of the children and was awarded child support in the amount of $591.67 per month and alimony in the amount of $400 per month.

Various post-divorce actions ensued,[9] none of which directly impact upon this proceed-

2. Appellee accepted service of the Texas complaint and filed a one-paragraph response in which she informed the Texas court of her earlier-filed divorce action; suggested that Appellant was still a West Virginia resident; and asked the Texas court to dismiss its proceeding based on the pendency of the West Virginia civil action.

3. See W.Va.Code § 48–20–206 (2001) (requiring court informed of earlier initiated child custody proceeding to stay its proceeding; communicate with other court; and dismiss its proceeding provided initial state has jurisdiction substantially in accordance with Uniform Child Custody Jurisdiction Act provisions and does not determine that second state is "a more appropriate forum"); accord Tex. Fam.Code Ann. § 152.206 (2002).

4. Providing no explanation as to why it refused to dismiss the Texas action, the Texas court offered only a one-sentence written response to the West Virginia Family Law Master, dated October 18, 1994: "Under these circumstances, it appears Texas is the home state and we do intend to proceed with jurisdiction regarding the suit affecting parent-child relationship."

5. A copy of this order was transmitted via facsimile to the Texas court.

6. The Texas court held a hearing on December 30, 1994, during which time a fill-in-the blank Report and Recommendation in Final Divorce was completed.

7. The Texas court, in making its custodial determination, found that "[t]here is a close geographical proximity of the homes of the parents." As Appellee observes in her brief, "Putnam County, WV and El Paso, TX are approximately 1700 miles apart."

8. This recommended order was entered on February 22, 1995.

9. For example, Appellant filed a Motion for Enforcement of Final Decree in the Texas court system on May 3, 1995, seeking to prevent compliance by the U.S. Army Finance and Accounting Center with an income withholding notice issued in connection with the West Virginia order of support. Appellant later filed a pro se Motion to Vacate with the West Virginia court on July 11, 1995, asking the West Virginia court to grant full faith and credit to the Texas final order of divorce. On June 2, 1995, the Texas court entered an order enforcing its earlier final decree of divorce and ruled that the West Virginia divorce decree was "NULL AND VOID AND OF NO EFFECT WHATSOEVER." A second Mo-

ing, until the entry of an agreed order by the parties in the Circuit Court of Putnam County on February 3, 1997. Through counsel, Appellant and Appellee signed an agreed order that was aimed at resolving the continuing disputes concerning which court had jurisdiction over matters of custody, child support, and alimony, as well as reaching finality on those specific issues. The agreed order, in admittedly less than exemplary language, provides, in pertinent part, that:

That the Divorce Decree entered on January 13, 1996 and Order Enforcing said Decree entered on May 30, 1996, in the District Court of El Paso County, Texas, 205th Judicial District, shall be entered in this Court record and venue on all issues contained therein shall be by agreement of the parties changed to solely within the Circuit Court of Putnam County, West Virginia. That the said Texas Final Decree and Order Enforcing said Decree shall be and the same is hereby DISMISSED and the same shall have no force and effect, by agreement of the parties.

WHEREFORE, it is hereby ORDERED, ADJUDGED and DECREED that the [sic] upon dismissal of the Texas Final Decree that the Final Decree of Divorce entered in the Circuit Court of Putnam County on the above-referenced Civil Action Number is hereby ratified and confirmed as if fully set out herein and the same shall be bifurcated so that the Paragraphs 1, 2 (except that visitation shall may be modified by further order of the Court upon remand), 5, 7, 10, 11 and 13 shall remain as a FINAL DECREE; however, the issues in Paragraphs 3, 4, 6, 8, 9 and 12, shall have the force and effect of a

Temporary Order and continue as Ordered therein until further order of the Court.

Pertinent to this opinion are several of those paragraphs designated as having the force and effect of a temporary order: Paragraph 3 provides for child support of $591.67 per month; Paragraph 4 provides for alimony in the amount of $400 per month; Paragraph 6 concerns medical insurance; Paragraph 8 concerns equitable distribution; Paragraph 9 addresses allocation of marital debts; and Paragraph 12 involves fees.[10]

The agreed order further provides for service of the order upon the Texas court and declares the Texas order "entered there to West Virginia and the same is then DISMISSED and shall be NULL and VOID in effect and unenforceable." Based on the inclusion of a *nunc pro tunc* clause, the agreed order provides for the terms of such order to take effect on December 12, 1996.

Other than a notice of appearance by new local counsel on Appellant's behalf in June 1997, no action was taken relative to this matter until February 25, 2000, when the West Virginia Bureau for Child Support Enforcement ("Child Support Bureau") filed a motion for decretal judgment against Appellant seeking to collect a child support and alimony arrearage.[11] At a hearing before the family law master on this motion, Appellant challenged the jurisdiction of the West Virginia court at the entry of the final order of divorce. He further argued that Texas continued to maintain jurisdiction over this matter, notwithstanding the entry of the agreed order.

tion to Vacate was filed for Appellant in 1996, through which he sought dismissal of the West Virginia divorce order for noncompliance with the Soldier's and Sailor's Relief Act. *See* 50 U.S.C. § 520 (1994) (providing relief from judgments obtained against military personnel where personnel prejudiced in defending against action due to military service and providing for appointment of counsel).

10. Those paragraphs of the West Virginia divorce decree upon which the parties agreed shall be a final decree were: Paragraph 5 which requires Appellant to maintain medical insurance on the children; Paragraph 7 which provides for auto-

matic withholding of child support payments by DHHR; Paragraph 10 which addresses responsibility for marital indebtedness; Paragraph 11 which involves pension entitlement; and Paragraph 13 which addresses the payment of fees.

11. The Bureau for Child Support Enforcement sought an arrearage for child support in the amount of $2,663.73 and for alimony payments in the amount of $16,877.16 for the period of October 1, 1994, through January 31, 2000. These amounts were calculated based on the monthly obligations established by the Circuit Court of Putnam County in the final decree of divorce entered on May 11, 1995.

By order dated October 20, 2000, the family law master concluded that West Virginia was the home state of the children under the Uniform Interstate Family Support Act ("UIFSA")[12] and had continuing exclusive jurisdiction of issues of child and spousal support under the UIFSA. Citing the agreed order's recognition of West Virginia as the "controlling order" relative to support issues, the family law master looked to the amounts of support set forth therein and granted a decretal judgment against Appellant as of March 30, 2000, in the amounts of $2,864.86 for child support arrearage and $17,874.00 for alimony arrearage. Appellant sought review of the family law master's findings with the circuit court, again raising the issue of whether West Virginia had jurisdiction of this matter.[13]

Upon its careful consideration of this critical issue of jurisdiction, the circuit court concluded that West Virginia did not have jurisdiction over Appellant when the West Virginia final decree of divorce was entered in May 1995. In its ruling of June 28, 2001, the circuit court determined that West Virginia did not acquire personal jurisdiction over Appellant until the entry of the agreed order on February 3, 1997.[14] Based on this acquisition of personal jurisdiction in 1997, the circuit court affirmed the family law master's order finding Appellant in arrearage for both child support and alimony payments that had accrued since the entry of the West Virginia divorce.[15] Appellant challenges the circuit court's ruling in the June 28, 2001, order that the West Virginia divorce decree was given full force and effect

retroactively from its May 1995 entry based upon its conclusion that by virtue of the entry of the agreed order on February 3, 1997, the parties had conferred jurisdiction upon the West Virginia court to enforce the West Virginia divorce decree under the terms of the agreed order.

## II. Standard of Review

▮▮▮▮ As we held in syllabus point four of *Burgess v. Porterfield*, 196 W.Va. 178, 469 S.E.2d 114 (1996), "[t]his Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo*." With this standard in mind, we proceed to determine whether the lower court committed error.

## III. Discussion

Appellant attacks the conclusion of the circuit court that he submitted to the West Virginia court's jurisdiction through his counsel's signature to the agreed order.[16] Appellant argues that the circuit court erred when it held that the parties had conferred jurisdiction to permit retroactive enforcement of the West Virginia divorce decree through entry of the agreed order. In addition, Appellant argues that West Virginia was without the requisite subject matter jurisdiction to enter the order that is the subject of this appeal as these matters were not subject to further consideration under *res judicata* principles, having been ruled upon previously by the Texas court.[17]

**12.** *See* W.Va.Code §§ 48–16–101 to –903 (2001).

**13.** The family law master did not address the issue of whether West Virginia had jurisdiction over Appellant at the time of the entry of the West Virginia divorce decree. The only finding as to jurisdiction pertained to the UIFSA.

**14.** The circuit court specifically rejected Appellee's argument that service was effected on Appellant via the long-arm statute of this state and this Court's holding in *Lozinski v. Lozinski*, 185 W.Va. 558, 408 S.E.2d 310 (1991), concerning the use of non-payment of child support as a tortious act for purposes of effecting service under West Virginia Code § 56–3–33 (1984) (Repl. Vol.1997), provided the statutory requirements for asserting jurisdiction have been met.

**15.** The circuit court's rationale in finding that Appellant owed child support and alimony from the date of the West Virginia divorce, rather than from the effective date of the agreed order, appears to be the language of the agreed order giving full force and effect to the terms of the West Virginia divorce decree.

**16.** The circuit court observes in its order that Appellant has made no allegation that his counsel had no authority to sign the agreed order on his behalf.

**17.** We reject this argument without further discussion.

**490**

## A. Jurisdiction

As we recently recognized in *Burnett v. Burnett*, 208 W.Va. 748, 542 S.E.2d 911 (2000), "[i]t is a fundamental principle of law that a court must possess both *in personam* jurisdiction and subject matter jurisdiction in order to exercise authority in a case." *Id.* at 753, 542 S.E.2d at 916. Appellant challenges the jurisdiction of the West Virginia court on both personal and subject matter grounds. Because he refused to accept service of the divorce complaint, Appellant argues that personal jurisdiction was never obtained over him when the West Virginia action was initiated. In its order, the circuit court expressly rejected Appellee's argument that West Virginia obtained *in personam* jurisdiction over Appellant via the long-arm statute for failure to pay child support. *See* W.Va.Code § 56-3-33 (1984) (Repl.Vol.1997); *Lozinski v. Lozinski*, 185 W.Va. 558, 408 S.E.2d 310 (1991). Unlike the facts presented to this Court in *Lozinski*, the complaint in the case *sub judice* did not contain averments concerning Appellant's failure to support his children or averments demonstrating any other basis for coming within the "single acts" enumerated in West Virginia § 56-3-33, which permit application of the long arm statute and the exercise of substituted service through the West Virginia Secretary of State.[18] *See Lozinski*, 185 W.Va. at 561–63, 408 S.E.2d at 313–315. Accordingly, the circuit court correctly determined that the *Lozinski* decision was simply inapposite.

The circuit court's sole basis for determining that Appellant had voluntarily submitted himself to *in personam* jurisdiction of the West Virginia court was his involvement in these matters incident to preparing an agreed order and the eventual entry of such order. As the circuit court indicated in its order, Appellant "has not provided this Court

with any evidence that his counsel at the time, Timothy C. Bailey, did not have the authority to sign the Agreed Order." Given the lack of any challenge to the agreed order and its entry, Appellant has no basis from which to deny that he voluntarily submitted himself to the personal jurisdiction of the West Virginia court by reason of the agreed order.

With regard to the issue of subject matter jurisdiction and the lower court's ruling that jurisdiction had been conferred, Appellant appears to suggest that the circuit court was ruling that subject matter jurisdiction resulted *only* from the parties' consent to the agreed order. It is well settled that whereas, "[j]urisdiction of the person may be conferred by consent, . . . jurisdiction of the subject-matter of litigation must exist as a matter of law." *State ex rel. Hammond v. Worrell*, 144 W.Va. 83, 90, 106 S.E.2d 521, 525 (1958), *overruled on other grounds as stated in Patterson v. Patterson*, 167 W.Va. 1, 277 S.E.2d 709 (1981). Separate and apart from the agreed order, West Virginia had jurisdiction to resolve matters of child custody and, upon the occurrence of *in personam* jurisdiction over both parties, West Virginia had jurisdiction to determine the consequent financial obligations arising under the divorce. The necessary subject matter jurisdiction arose under certain uniform domestic acts and through operation of the doctrine of divisible divorce. We proceed to discuss in detail the origin of the West Virginia court's subject matter jurisdiction, given its integral significance to the issue before us.

## B. Uniform Acts

From the first filing, which was the divorce complaint filed by Appellee, West Virginia was the proper state under the Uniform Child Custody Jurisdiction Act ("UCCJA") to assert subject matter jurisdiction

---

**18.** Given this Court's clear recognition in *Lozinski* that the use of the long-arm statute for purposes of obtaining personal jurisdiction over non-residents who were failing to support children residing in this state was necessitated by the absence of a " 'domestic relations' long-arm statute," it is arguable that with the adoption of the UIFSA and its clear provisions for obtaining jurisdiction over non-residents for purposes of

establishing, enforcing, or modifying a support order, reliance on the holding in *Lozinski* for obtaining service over non-residents is no longer necessary. *See* 185 W.Va. at 563, 408 S.E.2d at 315. We note, however, that one of the enumerated bases for obtaining service over a non-resident under the UIFSA is the commission of a tortious act for failure to support a child resident in this state. W.Va.Code § 48–16–201.

over the issues of custody and the related issue of child support. Under the UCCJA, which both Texas and West Virginia have adopted and codified, the jurisdictional prerequisites are the same:

(a) A court of this State which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:

(1) This State (i) is the home state of the child at the time of commencement of the proceeding or (ii) has been the child's home state within six months before commencement of the proceeding, the child is absent from this State because of his removal or retention by a person claiming his custody or for other reasons and a parent or person acting as parent continues to live in this State; or

(2) It is in the best interest of the child that a court of this State assume jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a significant connection with this State, and (ii) there is available in this State substantial evidence concerning the child's present or future care, protection, training and personal relationships; or

(3) The child is physically present in this State, and (i) the child has been abandoned, or (ii) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent; or

(4) (i) It appears that no other state would have jurisdiction under prerequisites substantially in accordance with subdivision (1), (2) or (3) of this subsection, or another state has declined to exercise jurisdiction on the ground that this State is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that this court assume jurisdiction.

W.Va.Code § 48–10–3 (1981) (Repl.Vol. 1999);[19] see Tex. Fam.Code Ann. § 11.53 (1994).[20]

After examining the factors set forth in the UCCJA for determining jurisdiction, the West Virginia Family Law Master determined that the children of the parties were residents of West Virginia. The facts in the record demonstrate that Appellee was similarly never a resident of Texas. Consequently, West Virginia, rather than Texas, was the state that satisfied the jurisdictional prerequisites of the UCCJA, given that West Virginia was, under the facts of this case, the state with which Appellee and the parties' children had a "significant connection" and the state in which "substantial evidence" was available pertinent to the children's "present or future care, protection, training and personal relationships." W.Va.Code § 48–10–3. Given the complete absence of any contacts with the state of Texas as contrasted with the continuous residence of Appellee and the children in West Virginia beginning in 1990, West Virginia, and not Texas, was the preferred jurisdictional forum under the UCCJA. This conclusion is required given the UCCJA's objective of establishing jurisdiction in the state where "significant evidence concerning ... [the child's] care, protection, training and personal relationships is most readily available." W.Va.Code § 48–10–1 (1981) (Repl.Vol.1999).

Beyond the jurisdictional provisions, another provision of the UCCJA similarly mandated that Texas should have refused to exercise jurisdiction over this matter. In full anticipation of dueling proceedings, the UCCJA addresses which state should exercise jurisdiction in the event of simultaneous proceedings filed in separate states:

(a) Except as otherwise provided in section 20–204,[21] a court of this state may not exercise its jurisdiction under this article if, at the time of the commencement of the proceeding, a proceeding concerning the custody of the child has been commenced

---

19. The current version of this statute is found at West Virginia Code § 48–20–201 (2001). We will cite to the version of the statute that was in effect at the time of the proceedings surrounding the entry of the agreed order, rather than to the current statutory version of the UCCJA.

20. The current version of this statute is found at Texas Family Code § 152.201 (2002).

21. This provision deals with temporary emergency jurisdiction.

in a court of another state having jurisdiction substantially in conformity with this chapter, unless the proceeding has been terminated or is stayed by the court of the other state because a court of this state is a more convenient forum under 20–207.[22]

W.Va.Code § 48–20–206 (footnotes supplied).[23] As required under the UCCJA, the West Virginia Family Law Master, contacted the Texas court to inform it of the pending West Virginia divorce action which was filed prior to the Texas action. As related above, the Texas court, with no explanation, refused to comply with the directives of the UCCJA regarding simultaneous proceedings.[24] *See supra* note 4.

Just as the jurisdictional factors set forth in the UCCJA clearly weigh in favor of West Virginia over Texas, the jurisdictional factors contained in the federal Parental Kidnapping Prevention Act ("PKPA") point in only one direction—towards West Virginia. *See* 28 U.S.C. § 1738A (2001). The PKPA, which defines the conditions under which the child custody order of one state must be accorded full faith and credit by another state, identifies the same jurisdictional grounds as those utilized in the UCCJA. Those factors include: (1) whether the state which issued the order is or was the home state of the child; (2) whether it appears that no other state would have jurisdiction and it is in the best interest of the child for the state to assume jurisdiction based upon the child's and one other party's significant connection with the state and the availability of substantial evidence concerning the child; (3) whether the child is physically present in the state; and (4) whether any other state has jurisdiction under these factors or has declined to exercise jurisdiction. 28 U.S.C. § 1738A(c). Thus, had Appellant been awarded custody of his children by the Texas court and sought to enforce such an order in West Virginia,

---

**22.** The inconvenient forum provision, which appears in both the Texas and West Virginia UCCJA states that:

(b) Before determining whether it is an inconvenient forum, a court of this state shall consider whether it is appropriate for a court of another state to exercise jurisdiction. For this purpose, the court shall allow the parties to submit information and shall consider all relevant factors, including:

(1) Whether domestic violence has occurred and is likely to continue in the future and which state could best protect the parties and the child;

(2) The length of time the child has resided outside this state;

(3) The distance between the court in this state and the court in the state that would assume jurisdiction;

(4) The relative financial circumstances of the parties;

(5) Any agreement of the parties as to which state should assume jurisdiction;

(6) The nature and location of the evidence required to resolve the pending litigation, including testimony of the child;

(7) The ability of the court of each state to decide the issue expeditiously and the procedures necessary to present the evidence; and

(8) The familiarity of the court of each state with the facts and issues in the pending litigation.

W.Va.Code § 48–20–207 (2001); Tex. Fam.Code Ann. § 152.207 (2002).

**23.** The Texas Code has this exact same provision. *See* Tex. Fam.Code Ann. § 152.206 (2002).

**24.** Under the Uniform Interstate Family Support Act, which Texas adopted in 1995 and West Virginia adopted in 1998, Texas was similarly required to refuse to exercise jurisdiction under an analogous simultaneous proceedings provision:

(a) A tribunal of this state may exercise jurisdiction to establish a support order if the petition or comparable pleading is filed after a pleading is filed after a pleading is filed in another state only if:

(1) the petition or comparable pleading in this state is filed before the expiration of the time allowed in the other state for filing a responsive pleading challenging the exercise of jurisdiction by the other state;

(2) the contesting party timely challenges the exercise of jurisdiction in the other state; and

(3) if relevant, this state is the home state of the child.

(b) A tribunal of this state may not exercise jurisdiction to establish a support order if the petition or comparable pleading is filed before a petition or comparable pleading is filed in another state if:

(1) the petition or comparable pleading in the other state is filed before the expiration of the time allowed in this state for filing a responsive pleading challenging the exercise of jurisdiction by this state;

(2) the contesting party timely challenges the exercise of jurisdiction in this state; and

(3) if relevant, the other state is the home state of the child.

Texas Fam.Code Ann. § 159.204 (1995); *accord* W.Va.Code § 48–16–204 (2001).

the provisions of the PKPA would not have required this state to enforce the custody determination given the clear lack of jurisdiction on the part of the Texas court with regard to issues of custody. *See id; see generally W.Va. DHHR ex rel. Hisman v. Angela D.*, 203 W.Va. 335, 507 S.E.2d 698 (1998) (applying provisions of UCCJA and PKPA to determine that West Virginia was not required to extend full faith and credit to Ohio decree).

Applying the provisions of yet another uniform act—the UIFSA—an act which expressly addresses conflicts arising in connection with child and spousal support obligations issued by different states, similarly results in the conclusion that Texas does not have jurisdiction over matters of support. *See supra* note 22. Upon our review of these three uniform acts, we are left with the firm conviction that West Virginia undisputedly had subject matter jurisdiction over issues pertinent to child custody and support obligations. However, because Texas had jurisdiction to issue a divorce decree, we proceed to a discussion of the doctrine of divisible divorce.

### B. Divisible Divorce Doctrine

 We recently explained this doctrine in syllabus point five of *Snider v. Snider*, 209 W.Va. 771, 551 S.E.2d 693 (2001):

> Under the divisible divorce doctrine, where a foreign jurisdiction does not have personal jurisdiction over both parties to a marriage, the personal and property rights of the parties may be litigated in West Virginia separately from a divorce decree issued in another jurisdiction. Spousal support and marital property rights, available under *W.Va.Code*, 48-2-15 [1999], survive such an *ex parte* foreign divorce decree when the foreign court did not have personal jurisdiction over the defendant in the foreign proceeding.

209 W.Va. at 773, 551 S.E.2d at 695; *see generally Estin v. Estin*, 334 U.S. 541, 549, 68 S.Ct. 1213, 92 L.Ed. 1561 (1948) (adopting doctrine of divisible divorce as means of accommodating separate interests of each state to matters of "dominant concern").

In its June 28, 2001, order, the circuit court recognized the doctrine of divisible divorce in connection with its conclusion that West Virginia lacked personal jurisdiction over Appellant in May 1995 when a divorce decree was issued in this state. Applying this doctrine, the circuit court ruled that the May 11, 1995, divorce decree "was void in so far as it ordered the Defendant [Appellant] to pay child support and alimony." While this conclusion was correct, the lower court appears to have overlooked the fact that the Texas divorce, entered on January 13, 1995, which preceded the West Virginia divorce by several months, served to sever the bonds of matrimony between the parties. The parties were no longer married at the time the West Virginia final decree was entered.

The lack of personal jurisdiction over Appellant at the time of the divorce, as the circuit court correctly recognized, prevented the West Virginia court from addressing matters beyond the divorce itself. *See Burnett*, 208 W.Va. at 755, 542 S.E.2d at 918. Only when the West Virginia court obtained personal jurisdiction over Appellant could the financial issues of child support and alimony be resolved. Ultimately, the necessary *in personam* jurisdiction was obtained over Appellant through his consent to the entry of the agreed order.

### C. Amount of Decretal Judgment

 Appellant suggests that the language of the agreed order which provides for the terms to take effect upon the dismissal of the Texas decree prevents enforcement of the specified amounts of child support and alimony. We disagree. Because the West Virginia court clearly did not have authority to order the Texas court to dismiss its final decree of divorce, that aspect of the agreed order was extra-jurisdictional and unenforceable by a West Virginia court. Moreover, the dismissal of the Texas divorce decree arguably would have placed the parties in the precarious position of no longer being divorced. Rather than constituting a condition precedent to effectuating the terms of the agreed order, the proposed dismissal of the Texas decree appears to have been motivated more by a desire to eliminate any further jurisdictional battles. The agreed order re-

flects an indisputable intent on the part of Appellant and Appellee to reach a consensus as to those issues specifically addressed in the order. Accordingly, we determine that the amounts of child support and alimony that were specified in the agreed order, amounts which indicate clear agreement by the parties, are subject to enforcement by the courts of this state.

No issue exists as to the enforceability of the agreed order as far as the amounts of child and spousal support reflected therein from the effective date of the order forward, given the existence of both personal and subject matter jurisdiction relative to the entry of the agreed order. The only issue is whether the circuit court erred in ordering that the agreed order, by its terms, reached back to the date of the West Virginia divorce decree for purposes of the decretal judgment sought by the Child Support Bureau.

In this Court's opinion, the lack of personal jurisdiction over Appellant at the time of the West Virginia divorce decree prevents this Court from finding Appellant obligated to pay child and spousal support at the rates set forth in the West Virginia divorce decree prior to the entry of the agreed order. Accordingly, we affirm the lower court's conclusion that it had personal and subject matter jurisdiction over Appellant at the time of the entry of the agreed order, but we reverse the determination that the West Virginia divorce decree, and specifically the amounts of child and spousal support set forth therein, could be enforced retroactively to the date of the West Virginia divorce decree. The absence of personal jurisdiction over Appellant combined with the lack of any express language in the agreed order addressing the imposi-

tion of such amounts retroactive to the date of the West Virginia divorce decree is fatal to the lower court's ruling. West Virginia is simply without authority to enforce any child support obligation that might have been thought to arise under the agreed order during the period of time between the entry of the West Virginia final decree of divorce and the entry of the agreed order.[25]

## C. Final Order

As we earlier acknowledged, the language employed in the agreed order is far from perfect. It would be advisable for the parties to prepare a revised agreed order that omits the language referencing the dismissal of the Texas divorce decree and attempting to hold the same as null and void and of no effect.[26] Additionally, the manner in which the child and spousal support obligations are provided for in the agreed order indicates that such obligations will continue in force and effect as a temporary order. In preparing and entering a revised order, the family court should determine whether any further hearings or filings are necessary to convert the agreed order into a final order with regard to the obligations of child support and alimony payments.

Based on the foregoing, the decision of the Circuit Court of Putnam County is affirmed insofar as it correctly determined that the lower court had both personal and subject matter jurisdiction over Appellant at the time of the entry of the agreed order, but reversed as to its conclusion that the agreed order could, by means of incorporating the terms of the West Virginia final decree of divorce that was entered without the exercise of personal jurisdiction over Appellant,

---

**25.** We are mindful, however, that the obligation of child support, while not enforceable from the time of the divorce decree for want of *in personam* jurisdiction over Appellant nonetheless may be sought for that period up to the time of the effective date of the agreed order under the principles discussed in *Hartley v. Ungvari*, 173 W.Va. 583, 318 S.E.2d 634 (1984) (recognizing that reimbursement child support could be awarded against non-custodial parent over whom West Virginia did not have *in personam* jurisdiction upon obtainment of such jurisdiction, but requiring consideration of laches in considering propriety of such award). Any such action would require, at a minimum, the filing of additional

pleadings, or alternatively, the institution of a new action. We take no position as to whether reimbursement child support should be awarded under the facts of this case, noting only that child support payments were purportedly made by Appellant pursuant to the Texas decree of divorce at a rate of $400 per month. We are uncertain as to what amount of the arrearage sought by the Child Support Bureau, if any, arose from the Texas award of child support.

**26.** By the now, the parties should realize that they would find themselves in a precarious position if the Texas divorce decree was dismissed.

establish a retroactive date for purposes of implementing the child and spousal support obligations that are set forth in the agreed order. Upon remand,[27] the appropriate amount of a decretal judgment shall be determined for those payments of alimony and child support falling due under the terms of the agreed order from and after the date of entry of that order[28] and remaining unpaid, together with any amount of interest deemed owing, and an order reflecting such amount entered. Because the provisions of the agreed order regarding several issues, including child support and alimony, have only the effect of a temporary order by the express terms of the order, the court, on remand, is encouraged to proceed to further determine the appropriate terms of a final order on those issues.

Affirmed, in part; Reversed, in part.

DAVIS, Chief Justice, dissenting.

(Filed Nov. 22, 2002)

In this proceeding, the majority opinion concluded that the circuit court had no personal jurisdiction over Gary Dean Ellithorp, for the purpose of granting his spouse, Nancy L. Ellithorp, a divorce on May 11, 1995. The majority opinion found that a divorce decree granted to Mr. Ellithorp, by a Texas court on January 13, 1995, was valid and controlling. Consequently, the majority opinion found that the circuit court could not enforce a 1997 agreed order by the parties, which incorporated the divorce, alimony and child support provisions of the West Virginia divorce decree. As I explain below, the majority opinion reached the wrong result by incorrectly analyzing the personal jurisdiction issue. Therefore, I dissent.

## A. The Circuit Court Had Personal Jurisdiction to Award Alimony and Child Support

Because he was living in Texas, the majority opinion determined that the circuit court had no personal jurisdiction over Mr. Ellithorp when Ms. Ellithorp filed for divorce on July 21, 1994. Consequently, the majority reasoned that the circuit court could not award alimony and child support in its 1995 divorce decree. I disagree.

In Syllabus point 3 of *Shaw v. Shaw*, 155 W.Va. 712, 187 S.E.2d 124 (1972) we held that "[a] change in residence for convenience in working conditions does not, without more, indicate a change in domicile." We have explained that "[d]omicile is a place a person intends to retain as a permanent residence and go back to ultimately after moving away." Syl. pt. 2, in part, *Shaw, id.* In Syllabus point 8, in part, of *White v. Manchin*, 173 W.Va. 526, 318 S.E.2d 470 (1984) we held " '[i]f domicile has once existed, mere temporary absence will not destroy it, however long continued.' " (quoting Syl. pt. 2, *Lotz v. Atamaniuk*, 172 W.Va. 116, 304 S.E.2d 20 (1983)).

In the recent opinion of *Snider v. Snider*, 209 W.Va. 771, 551 S.E.2d 693 (2001), we addressed the issue of the authority of courts in West Virginia to award alimony when only one party is physically present in the state.[1]

---

27. We are remanding this matter directly to the Circuit Court of Putnam County, recognizing that the circuit court may opt to retain this matter or to refer it to the Family Court of Putnam County for further proceedings. *See* § 51-2A-2 (2001). In the event the circuit determines to transfer this matter to the jurisdiction of the Family Court, an appropriate order shall be entered to that effect and the Family Court shall proceed to resolve the issues in accordance with this opinion. Orders entered by the Family Court would be subject to the rights of appeal set forth in West Virginia Code § 51-2A-11(2001).

28. We are aware that the agreed order recites that it is a *nunc pro tunc* order. However, we find that its enforceability is limited to that time from and after its date of entry, the date upon which West Virginia clearly obtained *in personam* jurisdiction of both parties to this action.

1. In *Snider*, the parties were married on January 20, 1973, in Garrett County, Maryland. At the time of the divorce, the parties had two emancipated children. During the marriage, Mr. Snider was employed by five different glass companies and was required to move from West Virginia to Pennsylvania, back to West Virginia, and again to Pennsylvania. Between the period 1987 until 1993, Mr. Snider was employed by a glass company in New Jersey. In January 1994, the parties traveled to West Virginia to visit with Ms. Snider's family. While in West Virginia, the parties agreed that they would buy a townhouse that was being offered for sale in Bridgeport, West Virginia, and that they would live in the home when Mr. Snider retired. After several weeks, the parties returned to New Jersey and placed their New Jersey home on the market. The parties also made an offer to pur-

The family law master ruled that West Virginia courts had personal jurisdiction over Mr. Snider due to his numerous contacts with the state. In an order dated January 28, 2000, the circuit court ordered equitable distribution of the marital assets of the parties. The circuit court also required Mr. Snider to pay Ms. Snider $2,500.00 per month in spousal support, and to pay her attorney's fees.[2]

Mr. Snider appealed the circuit court's ruling on the grounds that he did not have sufficient minimum contacts in West Virginia for the circuit court to exercise personal jurisdiction over him. This Court rejected the argument. In addressing the issue of minimum contacts in *Snider*, we relied upon the principles of law set out in *Pries v. Watt,* 186 W.Va. 49, 410 S.E.2d 285 (1991). In *Pries* it was said that:

> In order to obtain personal jurisdiction over a nonresident defendant, reasonable notice of the suit must be given the defendant. There also must be a sufficient connection or minimum contacts between the defendant and the forum state so that it will be fair and just to require a defense to be mounted in the forum state.

Syl. pt. 2, *Pries,* 186 W.Va. 49, 410 S.E.2d 285. The decision in *Pries* also noted that

> [t]o what extent a nonresident defendant has minimum contacts with the forum state depends upon the facts of the individual case. One essential inquiry is whether the defendant has purposefully acted to obtain benefits or privileges in the forum state.

Syl. pt. 3, *Pries, id.* After applying the principles of *Pries* to the facts presented in *Snider*, we held that sufficient minimum contacts were made in West Virginia by Mr.

Snider to give the circuit court personal jurisdiction over him.

Here, Ms. Ellithorp presented evidence during the divorce proceeding which showed that, from 1990 to 1993, the parties lived in West Virginia with their two children. In June of 1993, Mr. Ellithorp joined the Army and was stationed in El Paso, Texas. Mr. Ellithorp left his wife and children in West Virginia and made no plans to take them to Texas. While in Texas, Mr. Ellithorp continued to claim West Virginia as his legal residence. Ms. Ellithorp proved this fact by presenting documents showing that, in 1994 Mr. Ellithorp listed West Virginia as his legal residence for tax purposes. In view of this evidence, it is patently illogical and legally wrong to conclude that personal jurisdiction over Mr. Ellithorp did not exist when he (1) left West Virginia solely for the purposes of his job, (2) allowed his family to remain in the state and enjoy the benefits from residency in the state, including having their children attend the state's public schools and (3) accepted the benefits of West Virginia's state tax laws. Clearly, this unrebutted evidence established minimum contacts in West Virginia by Mr. Ellithorp. Therefore, the trial court had personal jurisdiction over Mr. Ellithorp for the purpose of awarding alimony and child support.

### B. The Circuit Court Had Jurisdiction to Grant a Divorce

In addition to finding that the circuit court had no jurisdiction to award alimony and child support, the majority opinion also erroneously concluded that the circuit court had no jurisdiction to grant a divorce.

As previously indicated, Ms. Ellithorp filed for divorce on July 21, 1994. Service of

chase the townhouse in West Virginia. In March 1994, Mr. Snider began working as a consultant for a glass company in Elgin, Illinois. Three months later, the parties purchased the townhouse in Bridgeport. The parties sold their house in New Jersey in January 1995, and moved to the townhouse in West Virginia in March 1995. After moving to West Virginia, Mr. Snider returned to the contract job in Illinois. Although Mr. Snider spent most of his time in Illinois, he would periodically visit his home in West Virginia. Mr. Snider filed for divorce in Illinois on October 3, 1997, alleging that the parties had been separated on a continuous basis since March 1994. Ms. Snider coun-

tered by filing a divorce action in West Virginia on October 24, 1997.

The Illinois court granted a divorce on April 1, 1998. Mr. Snider then moved to dismiss the West Virginia divorce action on the grounds that, because of the Illinois judgment, the West Virginia courts lacked personal jurisdiction over him. On August 8, 1998, the family law master entered an order rejecting Mr. Snider's motion.

**2.** The circuit court gave full faith and credit to the Illinois divorce and therefore only decided property issues and alimony.

process was attempted through the Secretary of State's office. Mr. Ellithorp refused to accept process. *See State v. Robertson*, 124 W.Va. 648, 652, 22 S.E.2d 287, 290 (1942) ("Parties may not refuse service of processes of any court, and the efforts of these parties to escape service of process by refusing to accept and read the same did not destroy the effectiveness of the service thereof."). Instead, Mr. Ellithorp filed for a divorce in Texas on July 26, 1994, and had process served on Ms. Ellithorp. Through counsel, Ms. Ellithorp informed the Texas court that a divorce proceeding was pending in West Virginia, that the Texas courts had no jurisdiction over Ms. Ellithorp and that Mr. Ellithorp's tax information indicated that his domicile was in West Virginia. Moreover, on October 5, 1994, the family law master contacted the Texas court and apprised it of the pending case in West Virginia. The Texas court ignored the family law master's request that it refrain from proceeding with the case. Instead, on January 13, 1995, the Texas court granted Mr. Ellithorp a divorce and required him to pay $400 a month in child support. On May 11, 1995, the West Virginia circuit court issued an order awarding a divorce, awarded $591.67 a month for child support, and awarded to Ms. Ellithorp alimony in the amount of $400.00 per month.

This Court concluded that the circuit court's divorce decree was invalid and that the Texas divorce decree was valid. The majority opinion reached its conclusion through convoluted reasoning. The majority's reasoning, as best I can discern, is because the Texas divorce was granted "first in time," it should prevail, or alternatively, the circuit court had no jurisdiction over Mr. Ellithorp. Therefore, the Texas divorce should prevail. Both positions are wrong.

The "first in time" divorce argument was presented and rejected in *Rash v. Rash*, 173 F.3d 1376 (11th Cir.1999).[3] *Rash* involved "a dispute in federal court between a former husband and wife over the priority to be accorded to two competing state court [divorce] judgments entered in the courts of different states." *Rash*, 173 F.3d at 1378. The couple in *Rash* were residents of New Jersey. They moved to Florida for two years before the wife returned to their home in New Jersey. After the wife left Florida, the husband sued for divorce in Florida on February 25, 1994. The wife filed for divorce in New Jersey on March 21, 1994. On October 21, 1994 the Florida court granted a divorce to the husband. On June 19, 1995 New Jersey granted a divorce to the wife.

The husband in *Rash* argued "that the Florida judgment controls because it was first in time and that the Florida court had in personam jurisdiction over the wife[.]" *Rash*, 173 F.3d at 1381. The Eleventh Circuit rejected this argument. It did so after finding that the New Jersey court was the only court to expressly address the personal jurisdiction issue. Consequently, the Florida judgment was "not entitled to full faith and credit[.]" *Rash*, 173 F.3d at 1381.

In the instant proceeding, *Rash* controls. It is undisputed that Ms. Ellithorp never visited Texas. Through counsel, Ms. Ellithorp informed Texas authorities that they had no jurisdiction of the matter. The only record showing a court meaningfully addressing the issue of jurisdiction over both parties was the proceeding held before the West Virginia circuit court. The circuit court held a hearing and took evidence on the issue of jurisdiction over Mr. Ellithorp, before concluding that jurisdiction existed. Consequently, under *Rash*, the Texas divorce should not be accorded full faith and credit merely because it was first in time.[4]

---

**3.** In our decision in *Snider*, this Court rejected a "first in time" argument couched in a different context. In *Snider*, the husband argued that because "the Illinois court issued an order dissolving the parties' marriage first, the Illinois court deprived our courts of all authority to adjudge Ms. Snider's personal rights." *Snider*, 209 W.Va. at 777, 551 S.E.2d at 699. In our rejection of this argument we stated "[t]he consequence of accepting Mr. Snider's position would be that our State, where Ms. Snider is domiciled

and where the parties ostensibly maintained their marriage, would be forced by a foreign jurisdiction to abdicate its interest in protecting its own residents—married or otherwise." *Snider*, 209 W.Va. at 777, 551 S.E.2d at 699.

**4.** Assuming, for the sake of argument, that the ruling in *Rash* is not dispositive, the Texas divorce decree should still not be accorded full faith and credit. Our law is clear in holding that "[u]nder Article IV, Section 1, of the Constitution

The majority opinion also suggested that, regardless of the first in time issue, the circuit court had no jurisdiction over Mr. Ellithorp. The majority opinion states that "the dismissal of the Texas divorce decree arguably would have placed the parties in the precarious position of no longer being divorced."[5] In other words, the majority opinion concluded that the circuit court's divorce decree was invalid. Therefore, were the Texas divorce decree not honored, the parties would not be divorced. Such reasoning is simply wrong. This Court has long held that "[t]he jurisdiction over both parties to a marriage may be established in West Virginia upon a showing that one spouse is domiciled in West Virginia." *Snider*, 209 W.Va. at 776, 551 S.E.2d at 698 (citing *Carty v. Carty*, 70 W.Va. 146, 73 S.E. 310 (1911)).

The record is clear. Both parties lived as husband and wife in West Virginia prior to Mr. Ellithorp being sent to Texas by the Army. Ms. Ellithorp and her children never went to Texas. They remained in West Virginia. Disregarding the overwhelming evidence of West Virginia domiciliary by Ms. Ellithorp (and Mr. Ellithorp), the majority opinion ruled that the Texas divorce was valid even though Texas had no jurisdiction over Ms. Ellithorp. The majority further erroneously ruled that the West Virginia circuit court's divorce was invalid because it purportedly had no jurisdiction over Mr. Ellithorp. The only conclusion to be reached from this absurdity is that jurisdiction is grounded in the husband, not the wife. That is, under the majority's version of the facts, neither state had jurisdiction over both parties, but since Texas had jurisdiction over Mr. Ellithorp, only the Texas divorce is valid.

*This line of reasoning is unsupported by any case law in the country!*

In the final analysis, West Virginia had jurisdiction over Ms. Ellithorp and her children, and, based on unrebutted evidence, it had jurisdiction over Mr. Ellithorp. Consequently, the West Virginia divorce was valid and enforceable.

### C. The Circuit Court's Disposition was Determined after Agreement of the Parties

Mr. Ellithorp sought to challenge the 1997 agreed order entered by the circuit court. The agreed order was the result of Mr. Ellithorp's challenge to the enforcement of the child support order entered by the circuit court in its 1995 divorce decree. During the proceedings contesting child support, the parties reached a compromise. The parties agreed that the Texas divorce decree would not be binding and enforceable.[6] The parties also agreed that the provisions of the West Virginia divorce decree would be binding and enforceable. However, under the joint agreement, Mr. Ellithorp's obligations for child support and alimony under the divorce decree were deemed temporary until further order of the court. In 1997, the circuit court approved the agreed order submitted by both parties.

Nevertheless, in 2000, Mr. Ellithorp sought to invalidate the 1997 agreement after the West Virginia Bureau for Child Support Enforcement began efforts to collect child support arrearages. Mr. Ellithorp argued that the 1997 agreement was invalid because the West Virginia circuit court had no jurisdiction over him when the 1995 divorce de-

---

of the United States, a valid judgment of a court of another state is entitled to full faith and credit in the courts of this State." Syl. pt. 1, *State ex rel. Lynn v. Eddy*, 152 W.Va. 345, 163 S.E.2d 472 (1968). Full faith and credit may only be accorded to a "valid" judgment of another jurisdiction. The record in this case is clear in showing that the Texas divorce decree was invalid, because it sought not only to grant a divorce, but also to award child support without having jurisdiction over Ms. Ellithorp or the parties' children. *See* Syl. pt. 4, *Eddy*, 152 W.Va. 345, 163 S.E.2d 472 ("A judgment rendered by a court of another state or by a court of this State is subject to attack for lack of jurisdiction to render such judgment or for fraud in its procurement."). The

invalidity of the child support ruling nullified the legitimacy of the Texas divorce decree.

5. In footnote 26 of the majority opinion it further states that "the parties should realize that they would find themselves in a precarious position if the Texas divorce decree was dismissed."

6. The 1997 agreed order purported to dismiss the Texas divorce decree. I agree with the majority opinion that the circuit court did not have authority to dismiss a decree entered by a Texas court. However, this point did not invalidate the 1997 agreed order. The language attempting to dismiss the Texas decree was merely harmless and superfluous.

cree was entered. The West Virginia circuit court rejected the argument. As previously indicated, the majority opinion has agreed with Mr. Ellithorp that the circuit court lacked jurisdiction over him when the divorce was granted. I have already labored to show that the majority was absolutely wrong in finding that the circuit court lacked personal jurisdiction over Mr. Ellithorp. I will not retread my position on this issue. However, assuming arguendo, that the majority opinion was correct in concluding that, in 1995 the West Virginia circuit court had no jurisdiction over Mr. Ellithorp, such grounds still do not support the disturbance of the 1997 agreed order.

As an initial matter, it is well-established law in this state that "[a] party cannot invite the court to commit an error, and then complain of it." *Lambert v. Goodman,* 147 W.Va. 513, 519, 129 S.E.2d 138, 142 (1963). *See Shamblin v. Nationwide Mut. Ins. Co.,* 183 W.Va. 585, 599, 396 S.E.2d 766, 780 (1990) ("[T]he appellant cannot benefit from the consequences of error it invited."). Consequently, Mr. Ellithorp cannot complain to this Court about the 1997 agreed order because he helped formulate the order and submitted it to the court. *See* Syl. pt. 2, *Young v. Young,* 194 W.Va. 405, 460 S.E.2d 651 (1995) ("A judgment will not be reversed for any error in the record introduced by or invited by the party seeking reversal.").

The sole basis for Mr. Ellithorp's challenge to the 1997 agreed order was that the circuit court had no personal jurisdiction over him in 1995 when the divorce decree was entered. Therefore, the provisions of the 1995 decree could not be imposed upon him in 1997. The majority opinion agreed with this contention. However, one of the fluid points about personal jurisdiction that the majority opinion overlooked is that personal jurisdiction may be consented to or waived. That is " '[j]urisdiction of the person may be conferred by consent of the parties or the lack of such jurisdiction may be waived.'" *Kessel v. Leavitt,* 204 W.Va. 95, 117, 511 S.E.2d 720, 742 (1998) (quoting Syl. pt. 4, in part, *West Virginia Secondary Sch. Activities Comm'n v. Wagner,* 143 W.Va. 508, 102 S.E.2d 901 (1958)). In this case, Mr. Ellithorp consent-

ed to the jurisdiction of the circuit court in 1997, retroactive to the 1995 divorce proceeding that he failed to attend. Consequently, even if I accepted the majority's erroneous position that the circuit court did not have jurisdiction over Mr. Ellithorp in 1995, Mr. Ellithorp affirmatively consented to such jurisdiction in 1997. I know of no case law that would preclude a party from consenting to jurisdiction in a later proceeding involving the same parties and issues.

Based upon the foregoing, I respectfully dissent.