IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2026 Term

FILED

May 18, 2026

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 24-52

NICHOLAS A. GHAPHERY, D.O.,
as Personal Representative of the Estate of Austin Nickalus Ghaphery,
Plaintiff below, Petitioner,

v.

WHEELING TREATMENT CENTER, LLC, and
JOHN SCHULTZ, M.D.,
Defendants below, Respondents.

_____

Appeal from the Intermediate Court of Appeals of West Virginia
22-ICA-150
(Circuit Court of Ohio County, Civil Action No. 19-C-182)

REVERSED AND REMANDED
_____

Submitted: March 24, 2026
Filed: May 18, 2026

Patrick S. Cassidy, Esq.
Cassidy Law Firm, PLLC
Robert P. Fitzsimmons, Esq.
Fitzsimmons Law Firm PLLC
Wheeling, West Virginia
Counsel for the Petitioner

Rita Massie Biser, Esq.
Lynnette Simon Marshall, Esq.
Moore & Biser, PLLC
South Charleston, West Virginia
Counsel for the Respondents

JUSTICE TRUMP delivered the Opinion of the Court.

# SYLLABUS OF THE COURT

1.     "On appeal of a decision from the Intermediate Court of Appeals of West Virginia, the Supreme Court of Appeals of West Virginia applies a de novo standard of appellate review to a circuit court's entry of summary judgment." Syllabus Point 1, *Moorhead v. West Virginia Army National Guard*, 251 W. Va. 600, 915 S.E.2d 378 (2025).

2.     "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Casualty & Surety Company v. Federal Insurance Company of New York*, 148 W. Va. 160, 133 S.E.2d 770 (1963).

3.     "To establish a hospital-patient relationship, unless otherwise imposed by law, there must be a natural person who receives or should have received health care from a licensed hospital under a contract, expressed or implied. W. Va. Code, 55–7B–2(e) (1986)." Syllabus Point 7, in part, *Gooch v. West Virginia Department of Public Safety*, 195 W. Va. 357, 465 S.E.2d 628 (1995).

**TRUMP, Justice:**

The Petitioner, Nicholas A. Ghaphery, D.O., as personal representative of the estate of his son Austin Nickalus Ghaphery, appeals the November 16, 2023, Memorandum Decision of the Intermediate Court of Appeals (ICA) affirming the Circuit Court of Ohio County's September 21, 2022, order granting summary judgment in favor of the Respondents, Wheeling Treatment Center (WTC) and John Schultz, M.D., WTC's medical director, because no health care provider-patient relationship existed between Mr. Ghaphery and the Respondents. Having carefully considered the parties' briefs and the appendix record, having heard oral argument, and having reviewed the pertinent legal authorities, we reverse the decision of the ICA and remand this case to the circuit court for further proceedings.

## I. Facts and Procedural Background

Beginning in November 2016, Mr. Ghaphery[1] exhibited signs of substance abuse addiction. Sometime in September 2017, Mr. Ghaphery admitted to his father, Dr. Ghaphery, that he was using illicit drugs. Dr. Ghaphery began to look for treatment options for his son and ultimately arranged for Mr. Ghaphery to be seen by WTC, a medication-assisted treatment center. Medication-assisted treatment (MAT) "means the use of

---

[1]We refer to Austin Ghaphery as "Mr. Ghaphery" to distinguish him from his father, to whom we refer as "Dr. Ghaphery."

medications and drug screens, in combination with counseling and behavioral therapies, to provide a holistic approach to the treatment of substance use disorders." W. Va. Code § 16-5Y-2.[2] WTC treats only opioid addiction.

As required by the Code of State Rules (C.S.R.),[3] on September 28, 2017, Mr. Ghaphery went to WTC for an initial assessment to determine his suitability for participation in WTC's MAT opioid program. During this examination, Mr. Ghaphery was assessed by WTC counselor Jamie Coen-Pickens. The initial assessment included a urine

---

[2]The Medication-Assisted Treatment Program Licensing Act (the Act) was originally enacted by the Legislature in 2016 and codified at West Virginia Code §§ 16-5Y-1 to -13. The Legislature reenacted the Act in 2024 and recodified it at West Virginia Code §§ 16B-13-1 to -13. We refer to the version of the Act that was extant in 2017, the year of the events triggering Dr. Ghaphery's lawsuit. *See, e.g., Bd. of Educ. of Cnty. of Wyoming v. Dawson,* 249 W. Va. 211, 213 n.2, 895 S.E.2d 66, 68 n.2 (2023); *First Mercury Ins. Co., Inc. v. Russell*, 239 W. Va. 773, 776 n.4, 806 S.E.2d 429, 432 n.4 (2017); *Ellithorp v. Ellithorp*, 212 W. Va. 484, 491 n.19, 575 S.E.2d 94, 101 n.19 (2002).

[3]The 2017 version of the C.S.R. (*see* supra n.2) provided that:

> Any individual seeking admittance to the MAT program shall undergo a pre-admission initial assessment in order to determine whether the person meets the criteria for admission to a MAT program. The initial assessment, consisting of a physical assessment and intake screening, shall be conducted by the medical director, an approved program physician or a supervised physician extender. The initial assessment shall focus on the individual's eligibility and need for treatment and shall provide indicators for initial dosage level, if required and if admission is determined appropriate. The determination of admission eligibility shall be made using accepted medical criteria such as those listed in the latest approved version of the Diagnostic and Statistical Manual for Mental Disorders.

W. Va. C.S.R. § 69-11-21.2.

drug screen that was positive for THC and amphetamines, but negative for opioids. Ms. Coen-Pickens testified in her deposition, that, at the time of the assessment, Mr. Ghaphery was not displaying any signs of withdrawal. According to Ms. Coen-Pickens, this, coupled with the lack of opioids in his blood test results, indicated that Mr. Ghaphery was not a candidate for treatment at WTC. However, it is undisputed that during the assessment, concerns arose over whether Mr. Ghaphery might be suicidal. Ms. Coen-Pickens summoned Dr. Schultz, who testified in his deposition that he spoke with Mr. Ghaphery and assessed Mr. Ghaphery for suicidal risk. According to Ms. Coen-Pickens' deposition, upon further discussion among Ms. Coen-Pickens, Dr. Schultz, and Mr. Ghaphery, Mr. Ghaphery advised that he had been prescribed the antidepressant medication Lexapro by the Ghaphery family physician. After Mr. Ghaphery agreed to follow up with his family physician, he was allowed to leave WTC. It is undisputed that Mr. Ghaphery was advised by WTC that he was not eligible for admission into the WTC MAT program.

WTC's medical case note for September 28, 2017 (which designated Mr. Ghaphery as a Patient in the caption of the note) explained:

> Assessment/Admission – Austin came in today for his initial screening. Pt was assessed by counselor and determined not be in withdraw and meet for criteria for treatment. Concerned [sic] was noted that Pt was having suicidal ideations and had a plan to follow through with utilizing a gun. Pt reported being depressed and had a recent break-up of a long term relationship. Discussion was had with Clinical director[,] Medical director, and director that Pt was in need of a further assessment elsewhere. Attempts were made to contact Pt's emergency contact to inform the clinic was requesting further

3

evaluation. Multiple attempts were made but no-one was able to be contacted.

Pt was spoken to again by counselor regarding the concerns and attempted to contact his mother but was unsuccessful. Pt met with Cslr. and medical director and Pt. disclosed that he was prescribed Lexapro which he had not inform Cslr,. of him taking and agreed with the doctor to follow through with going to see the doctor next week.[4] Cslr gave Pt referral phone numbers for individual counseling. Pt agreed he would seek out treatment. Under this agreement with staff Pt. was allowed to leave the facility.

Thirty-six days later, on November 3, 2017, Mr. Ghaphery was found dead. The State Medical Examiner's Office autopsy report listed Mr. Ghaphery's cause of death as fentanyl, norfentanyl, heroin, amphetamine, and cocaine intoxication, with the manner of death identified as an accident.

On July 29, 2019, Dr. Ghaphery filed suit against WTC and Dr. Schultz in what the Complaint termed an "**ACTION FOR MEDICAL PROFESSIONAL LIABILITY RESULTING IN WRONGFUL DEATH**[.]" Specifically, the Complaint alleged that the WTC's non-physician staff and Dr. Schultz failed to meet the standard of care in providing services by failing to appropriately evaluate Mr. Ghaphery's condition and arrange for his transportation to a psychiatric facility and that these failures proximately caused Mr. Ghaphery's death. The Complaint cited both the Medical

---

[4]This reference to Mr. Ghaphery seeing the doctor next week was to Mr. Ghaphery seeing the Ghaphery family physician.

Professional Liability Act, W. Va. Code § 55-7B-1, et seq. and the Wrongful Death Act, W. Va. Code § 55-7-5, et. seq.

WTC and Dr. Schultz sought summary judgment, arguing that they had no duty to accept Mr. Ghaphery as a patient and that they owed him no duty to seek his commitment to a psychiatric facility. Their summary judgment motion also asserted that no act or omission by the Respondents was the proximate cause of Mr. Ghaphery's death. Dr. Ghaphery opposed the motion. By order entered July 27, 2021, the circuit court denied the Respondents' motion for summary judgment. It determined there remained genuine issues of material fact and that some of the Respondents' "allegations and conclusions [were] inconsistent with the records in the court file and with West Virginia Civil Law[,]" although without explaining what records or law created any alleged factual disputes.

On August 11, 2021, Dr. Ghaphery filed his *Plaintiff's Motion for Pre-Trial Ruling that Austin Ghaphery was a "Patient" for Purposes of Bringing the Instant Action Under the MPLA.* This motion requested the circuit court to find that, for purposes of bringing the action under the MPLA, Mr. Ghaphery was a patient of the Respondents at the time of the initial assessment and the suicide risk assessment. WTC and Dr. Schultz responded, asserting that there was no physician-patient relationship and no legal duty to provide medical services. The Respondents stated that they had a right to refuse to treat or otherwise accept Mr. Ghaphery as a patient and were at no time obligated to accept him as a patient, regardless of whether he qualified for treatment or not. Accordingly, they urged

5

that the Respondents' decision not to admit Mr. Ghaphery into the MAT program was not actionable. Dr. Ghaphery argued in response that once a "health care provider" renders "health care" to a person, that person is a "patient" under the MPLA, and the health care provider is required to meet the accepted standard of care in providing such "health care." The circuit court did not specifically rule on this motion.

On September 12, 2022, the Respondents filed *Defendants' Bench Brief - Requirement of Court to Determine Duty as a Matter of Law* in which they requested that the circuit court enter an order finding that they had no duty to accept Mr. Ghaphery as a patient or to treat him. Dr. Ghaphery responded by reiterating his position that "health care" was administered to Mr. Ghaphery during the initial assessment at WTC and that the Respondents had a duty to adhere to the applicable standard of care in evaluating and assessing Mr. Ghaphery.

On September 21, 2022, the circuit court entered its *Revised Order Granting Defendants' Motion for Summary Judgment and Finding that Defendants had no Duty to Accept or Treat the Decedent, Austin Ghaphery*.[5] In that order, the circuit court determined that "no patient-health care provider relationship was established upon which liability can

_____

[5]A circuit court enjoys the power to revisit interlocutory orders it has entered during litigation. "As long as a circuit court has jurisdiction over the case, then it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." Syl. Pt. 4, *Hubbard v. State Farm Indem. Co.*, 213 W. Va. 542, 584 S.E.2d 176 (2003).

6

be based." The court found WTC's denial of Mr. Ghaphery's admission into its MAT program to be critical and that when WTC denied Mr. Ghaphery admission, it then had no reason or legal duty to attempt to commit Mr. Ghaphery, either voluntarily or involuntarily. Therefore, the circuit court found that WTC had no duty to attempt to prevent Mr. Ghaphery's death after he was denied admission to the MAT program. The court further found that to avoid summary judgment, evidence beyond Mr. Ghaphery's presentation at WTC for an evaluation was required to demonstrate the existence of an express or implied contractual relationship. "Although [Mr. Ghaphery] was technically a 'patient' while he was there for the pre-admission assessment, he was not accepted as [a] patient thereafter because he was refused admission to the program." The circuit court found "that a hospital-patient relationship was not created merely by virtue of the assessment and evaluation by the doctor. Again, the critical fact is [Mr. Ghaphery] was not accepted for treatment. That ended any hope for him to be treated at [WTC]." The circuit court further ruled "that there is no duty of care owed to every person who is screened but not accepted for treatment as a patient, and, in this case, is never treated as a patient and who is never seen again."

Dr. Ghaphery appealed the circuit court's summary judgment order to the ICA. The ICA heard oral argument and by memorandum decision issued November 16, 2023, affirmed the circuit court's order. *Ghaphery v. Wheeling Treatment Ctr., LLC*, No. 22-ICA-150, 2023 WL 7922925 (W. Va. Ct. App. Nov. 16, 2023) (memorandum decision). The ICA determined that Mr. Ghaphery "received extremely limited 'health care' during his pre-admission initial assessment" and that the initial assessment "was presumably

7

'health care' within the meaning of the MPLA." As to a duty of care, the ICA concluded that determination hinged on whether Mr. Ghaphery was a "'patient' within the meaning of the MPLA." The ICA ruled that any health care that was provided to Mr. Ghaphery was "incidental" to determining eligibility for enrollment in the MAT program and "was not made under an implied or express contract to provide diagnosis or treatment." Because the Respondents determined that Mr. Ghaphery was ineligible to participate in WTC's MAT program and that he would not be a patient, the ICA concluded that no contract, either express or implied, was formed; no health care provider-patient relationship existed; and WTC did not owe Mr. Ghaphery a duty to provide care. Therefore, the ICA found that WTC "owed no duty to admit [Mr. Ghaphery] to its medication assisted treatment program." As to the theory that WTC owed a duty to follow the appropriate standard of care in performing the suicide assessment, the ICA found that Dr. Schultz "did not provide medical or psychiatric advice to [Mr. Ghaphery], other than emphasizing that he should keep his appointment with Dr. Schmitt [his family physician] or contact a crisis center if his mental status deteriorate[d]." The ICA determined that this conduct was "not medical advice which causes a duty to provide care." The ICA also found that Dr. Schultz's "belief that he had a duty to investigate [Mr. Ghaphery]'s suicidal ideations was not based on a legal requirement." Dr. Ghaphery now appeals to this Court.

8

## II.    Standard of Review

We have held that "[o]n appeal of a decision from the Intermediate Court of Appeals of West Virginia, the Supreme Court of Appeals of West Virginia applies a de novo standard of appellate review to a circuit court's entry of summary judgment." Syl. Pt. 1, *Moorhead v. W. Va. Army Nat'l Guard*, 251 W. Va. 600, 915 S.E.2d 378 (2025). "When reviewing a lower court's decision regarding summary judgment, we apply the same standard required of the circuit court." *Estate of Robinson ex rel. Robinson v. Randolph Cnty. Comm'n*, 209 W. Va. 505, 509, 549 S.E.2d 699, 703 (2001). Under that standard, "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. Pt. 3, *Aetna Cas. & Sur. Co. v. Fed. Ins. Co. of New York*, 148 W. Va. 160, 133 S.E.2d 770 (1963).  With these standards in mind, we turn to the issue presented in this appeal.

## III.    Discussion

Dr. Ghaphery has alleged claims of medical professional liability against WTC and Dr. Schultz that are grounded in health care provider-patient relationships between Mr. Ghaphery and the Respondents. The Respondents now contend that no duty existed under the MPLA and the facts of this case because Mr. Ghaphery was never accepted as a "patient" and thus there is no viable cause of action premised on the existence of a health care-patient relationship. *See* Syl. Pt. 1, *Parsley v. Gen. Motors Acceptance*

9

*Corp.*, 167 W.Va. 866, 280 S.E.2d 703 (1981) ("In order to establish a *prima facie* case of negligence in West Virginia, it must be shown that the defendant has been guilty of some act or omission in violation of a duty owed to the plaintiff. No action for negligence will lie without a duty broken.").

The existence of a health care provider-patient relationship is a prerequisite for the existence of a duty, without which a negligence action will not lie. "The essence of a medical malpractice action is a physician-patient relationship." *Rand v. Miller*, 185 W. Va 705, 706, 408 S.E.2d 655, 656 (1991). "Generally, it is axiomatic that unless such a relationship is established a legal duty cannot exist between the parties." *Gooch v. W. Va. Dep't of Pub. Safety*, 195 W. Va. 357, 366, 465 S.E.2d 628, 637 (1995).

Before embarking on the duty analysis before us, we distinguish between the existence of a duty—the only question presently before the Court—and the scope of that duty based on the limited role of the Respondents, which lies beyond the sole question framed in this appeal. The existence of a duty arising from the health care provider-patient relationship results in a legal obligation on behalf of the health care provider to act in accordance with the applicable standard of care as required by West Virginia Code § 55-7B-3.[6] Deviations from the applicable standard of care causing injury or death may give

---

[6]West Virginia Code § 55-7B-3 (2017) (*see* supra nn. 2 and 3) provided:

rise to liability. Importantly, however, the standard of care required of the Respondents under the circumstances of Mr. Ghaphery's assessment, the scope of the Respondents' duties, is not presently before this Court. Rather, we are asked only to consider the limited question of whether there was an implied or express contractual relationship between Mr. Ghaphery and WTC and Dr. Schultz, as informed by the MPLA's definitions of "patient" and "healthcare," sufficient to establish a duty to comply with the standard of care, whatever that standard may be under the circumstances in this case.

A duty of care extends to the health care-patient relationship based upon an implied or express contract for health care services: "[t]o establish a hospital-patient relationship, unless otherwise imposed by law, there must be a natural person who receives or should have received health care from a licensed hospital under a contract, expressed or implied. W. Va. Code, 55–7B–2(e) (1986)." Syl. Pt. 7, in part, *Gooch v. W. Va. Dep't of Pub. Safety*, 195 W. Va. 357, 465 S.E.2d 628. While the MPLA did not speak specifically to the creation of a health care provider-patient relationship, the contractual relationship

---

(a) The following are necessary elements of proof that an injury or death resulted from the failure of a health care provider to follow the accepted standard of care:

(1) The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and

(2) Such failure was a proximate cause of the injury or death.

11

giving rise to a duty is contemplated in the MPLA's definition of "patient:" "a natural person who receives or should have received health care from a licensed health care provider under a contract, expressed or implied." W. Va. Code § 55-7B-2(m) (2017). Relatedly, the 2017 MPLA defined "health care" as:

> (1) Any act, service or treatment provided under, pursuant to or in the furtherance of a physician's plan of care, a health care facility's plan of care, medical diagnosis or treatment;

> (2) Any act, service or treatment performed or furnished, or which should have been performed or furnished, by any health care provider or person supervised by or acting under the direction of a health care provider or licensed professional for, to or on behalf of a patient during the patient's medical care, treatment or confinement, including, but not limited to, staffing, medical transport, custodial care or basic care, infection control, positioning, hydration, nutrition and similar patient services; and

> (3) The process employed by health care providers and health care facilities for the appointment, employment, contracting, credentialing, privileging and supervision of health care providers.

W. Va. Code § 55-7B-2(e) (2017). The 2017 MPLA, in turn, defined a "health care provider" as:

> a person, partnership, corporation, professional limited liability company, health care facility, entity or institution licensed by, or certified in, this state or another state, to provide health care or professional health care services, including, but not limited to, a physician, osteopathic physician, physician assistant, advanced practice registered nurse, hospital, health care facility, dentist, registered or licensed practical nurse, optometrist, podiatrist, chiropractor, physical therapist, speech-language pathologist, audiologist, occupational therapist, psychologist, pharmacist, technician, certified nursing assistant, emergency medical service personnel,

12

emergency medical services authority or agency, any person supervised by or acting under the direction of a licensed professional, any person taking actions or providing service or treatment pursuant to or in furtherance of a physician's plan of care, a health care facility's plan of care, medical diagnosis or treatment; or an officer, employee or agent of a health care provider acting in the course and scope of the officer's, employee's or agent's employment.

W. Va. Code § 55-7B-2(g) (2017).

As to the creation of a health care provider-patient relationship, we have explained that "to maintain an action against a hospital a plaintiff must present sufficient facts to create a genuine issue of whether a hospital-patient relationship existed." *Gooch*, 195 W. Va. at 366, 465 S.E.2d at 637. Applying these concepts and definitions to the interaction between Mr. Ghaphery and the Respondents, we conclude that Dr. Ghaphery has carried his burden. For the reasons discussed below, Dr. Ghaphery has produced sufficient undisputed evidence to show that a health care provider-patient relationship existed between the Respondents and Mr. Ghaphery relative to the initial assessment of Mr. Ghaphery, regardless of whether WTC ultimately accepted Mr. Ghaphery into its MAT program.[7]

In the present case, Mr. Ghaphery went to WTC for an initial assessment to determine his suitability for medication-assisted treatment for his drug addiction. Such an

---

[7]*See, e.g., Russell v. May*, 400 P.3d 647, 657 (Kan. 2017) ("If the controlling facts relating to whether a physician-patient relationship existed are undisputed, a question of law arises. If, however, the controlling facts are at issue, the existence of a physician-patient relationship is usually a question of fact for the jury.").

13

assessment was required by C.S.R. § 69-11-21.2 (2017) before medication-assisted treatment could commence. WTC's medical note regarding Mr. Ghaphery designated him as a "Patient" in the caption of its note and then referred to him as a patient ("Pt") eleven times in the body of the note. This characterization of Mr. Ghaphery as a "patient" during his initial assessment is supported by the 2017 C.S.R. provisions governing the initial assessment to determine suitability for admission into an MAT program to address opioid addiction.

The 2017 C.S.R. provided for the contents of a preadmission initial assessment for opioid MAT treatment:

> 21.3. The initial physical assessment shall include documentation of:
>
> 21.3.a. A brief physical examination;
>
> 21.3.b. The patient's immediately relevant history, including, but not limited to, determination of chronic or acute medical conditions such as diabetes, renal disease, hepatitis, sickle cell anemia, tuberculosis, human immunodeficiency virus (HIV) exposure, sexually transmitted disease, chronic cardiopulmonary disease and pregnancy;
>
> 21.3.c. A determination of currently prescribed medication or utilized over-the-counter substances;
>
> 21.3.d. An evaluation of the patient's use of other substances of abuse and alcohol;
>
> 21.3.e. Determination of current substance use disorder;
>
> 21.3.f. Determination of length of substance use disorder;

14

21.3.g. An initial drug test and full drug screen to identify whether the patient is using other drugs, including opiates, methadone, buprenorphine, amphetamines, cocaine, barbiturates, benzodiazepines, marijuana or other drugs or substances as determined by community standards, regional variation or clinical indication, such as carisoprodol; to determine whether the individual has a substance use disorder from another MAT program;

21.3.h. An inquiry to and report from the Controlled Substances Monitoring Program database;

21.3.i. An inquiry whether the patient is enrolled in any other MAT program;

21.3.j. Identify comorbid medical and psychiatric conditions or disorders and to determine how, when and where they will be addressed;

21.3.k. Screen for communicable diseases and address them as needed and evaluate patient's level of physical, psychological and social functioning or impairment;

21.3.l. Assess the individual's access to social supports, family, friends, employment, housing, finances and whether any legal problems exist; and

21.3.m. Determine the patient's readiness to participate in treatment.

W. Va. C.S.R. § 69-11-21. The C.S.R. referred to the individual undergoing an initial assessment for admission into an MAT opioid program as a "patient" six times and defined a process that constituted health care. *See Minnich v. MedExpress Urgent Care, Inc.*, 238 W. Va. 533, 538, 796 S.E.2d 642, 647 (2017) ("Integral to the diagnosis and examination of a patient by a medical professional is the component of the health care visit that customarily precedes the actual physical examination. Absent the intake aspect of a

15

patient's visit to a health care provider, the examination would not be as properly focused or as likely to result in a correct diagnosis.").

The Respondents counter by relying on our decision in *Gooch*, wherein we found that no hospital-patient relationship existed and, hence, found no liability. The Court's decision in *Gooch* was based upon facts that are fundamentally different from the facts before us here. These critical differences show why *Gooch* does not control the question of whether a duty existed in the case before us.

Mr. Gooch was arrested on June 14, 1990, for driving under the influence. A State Trooper took Mr. Gooch to the hospital to have his blood drawn so that it might be tested for intoxicants. While Mr. Gooch was listed in the emergency room logbook, he was not admitted as a patient, and no referral was made for him to see a physician because he was there for the sole purpose of having his blood drawn for a test to determine if he was DUI. The hospital did not perform any type of analysis on the blood, nor did it even receive the test results. Mr. Gooch was released from jail on June 15, 1990, but later that day he was taken to a different hospital where he subsequently died of pneumonia. Mr. Gooch's estate sued the hospital that conducted the blood draw claiming it was negligent in failing to diagnose and treat his pneumonia. We affirmed a grant of summary judgment in favor of the hospital finding that

> [t]o establish a hospital-patient relationship, unless otherwise imposed by law, there must be a natural person who receives or should have received health care from a licensed

16

> hospital under a contract, expressed or implied. W. Va. Code, 55–7B–2(e) (1986). As a matter of law, a hospital-patient relationship cannot be created merely by virtue of an arrestee being presented to a hospital for a drug and alcohol blood test. To avoid summary judgment, a plaintiff must show sufficient additional evidence beyond the presentation for a driving under the influence blood test to demonstrate either an expressed or implied contract between the parties was created.

Syl. Pt. 7, *Gooch*, 195 W. Va. 357, 465 S.E.2d 628. Mr. Gooch's claim foundered on the lack of evidence of a hospital-patient relationship between him and the hospital that drew his blood. Comparatively, in the case now before us, evidence of such a relationship exists as a matter of fact and law. Mr. Ghaphery was not taken by the police to WTC for a forensic blood draw ancillary to a criminal charge. He went to WTC to explore treatment. WTC's September 28, 2017, medical note designated and repeatedly characterized Mr. Ghaphery as a "patient." The 2017 C.S.R. that governed MAT opioid programs also repeatedly described a person undergoing an initial MAT assessment as a "patient." The initial assessment required by C.S.R. § 69-11-21.2 constituted health care under the MPLA, and Dr. Schultz admitted to performing a suicide assessment on Mr. Ghaphery during the initial assessment. Consequently, regardless of whether WTC ultimately denied Mr. Ghaphery admission to its MAT program *based upon* its initial assessment of him, the circuit court correctly concluded that Mr. Ghaphery "was technically a 'patient' while he was [at WTC] *for* the pre-admission assessment." (emphasis added).

Therefore, the circuit court erred in granting WTC and Dr. Schultz summary judgment on the grounds that Mr. Ghaphery was never admitted into the WTC MAT

17

program and, we reverse the decision of the ICA which affirmed the circuit court's erroneous ruling in this regard.

We again stress that our resolution of this appeal is necessarily narrow because the circuit court likewise narrowly addressed whether Dr. Ghaphery demonstrated the existence of a healthcare provider-patient relationship between Mr. Ghaphery and the Respondents. We find that he did and, therefore, the Respondents owed a duty of care to Mr. Ghaphery during the initial assessment process. "Where, as here, the physician-patient relationship is established, the physician owes his or her patient a duty of care when rendering medical services." *Bellomy v. United States*, 888 F. Supp. 760, 764 (S.D. W. Va. 1995). Here, the medical services were limited to the initial assessment to determine suitability for the MAT program and WTC had a duty to perform that assessment in a non-negligent manner.

Whether Dr. Ghaphery can otherwise meet the remaining elements of his medical malpractice claims against the Respondents—by establishing the requisite standard of care under the circumstances, breach thereof, and that the alleged breach proximately caused Mr. Ghaphery's death[8]—is not before this Court, and we leave those

---

[8]*See Jones v. United States*, No. 2:11-CV-94, 2013 WL 12159102, at *11 (N.D. W. Va. Oct. 23, 2013) ("To successfully raise a medical malpractice claim, the plaintiff must establish the familiar elements common to all claims of negligence: duty, breach, causation, and damages. Mapped onto the medical environment, this means that the plaintiff must prove, by a preponderance of the evidence, (1) the applicable medical

issues for resolution in the circuit court in the litigation process. *See Dehn v. Edgecombe*, 834 A.2d 146, 161–62 (Md. Ct. Spec. App. 2003) (noting that an appellate court decides only "those limited issues that the appellate litigation process has squarely framed for decision[.]"), *aff'd*, 865 A.2d 603 (Md. 2005).

## IV.    Conclusion

The November 16, 2023, memorandum decision of the Intermediate Court and the summary judgment of the circuit court are reversed, and this case is remanded to the Circuit Court of Ohio County for further proceedings.

Reversed and Remanded.

---

standard of care; (2) that, in treating the plaintiff, the defendant failed to meet that standard of care; and (3) that the defendant's negligence was a proximate cause of plaintiff's injury.").